**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

CHRISTINA JACOBS,

     **Plaintiff,**

v.                                **CIVIL NO. 1:13cv164**
                                             **(JUDGE KEELEY)**

UNITED STATES OF AMERICA,

     **Defendant.**

## REPORT AND RECOMMENDATION

On June 26, 2013, Plaintiff filed a complaint against the United States of America, alleging medical negligence[1] and seeking relief under the Federal Tort Claims Act ("FTCA"). On July 3, 2013, Plaintiff was granted leave to proceed *in forma pauperis* and directed to pay an initial partial filing fee. Plaintiff paid the required fee on August 12, 2013. On September 3, 2013, upon initial review, Magistrate Judge David Joel issued a Report and Recommendation ("R&R") recommending that Plaintiff's complaint be dismissed for failure to state a claim upon which relief could be granted and as frivolous. Plaintiff timely objected, attached copies of some of her medical records and, for the first time, copies of an unsigned Notice of Claim[2] and a screening certificate of merit.[3] On September 26, 2013, Plaintiff filed a motion to supplement or amend her medical affidavit. By Order entered May 2, 2014, the September 3, 2013 R&R was declared moot, and the

---

[1] The complaint did not attach a Notice of Claim or a screening certificate of merit from a medical expert.

[2] Dkt.# 19-3 at 3.

[3] The certificate was dated April 13, 2013, and was provided by a South Carolina chiropractor, Cherron Jenkins. Dkt.# 19-3 at 1 - 2.

case was recommitted with instructions to reconsider the complaint in light of the documents filed after the R&R was entered. By separate Orders entered May 15, 2014, Plaintiff's motion to amend/correct her medical affidavit was granted, the supplement to the medical expert's affidavit was filed and Defendant was ordered to answer the complaint.

On July 8, 2014, Defendant filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment. Because Plaintiff was proceeding *pro se*, a <u>Roseboro</u> Notice was issued, advising Plaintiff of her right to file a response to Defendant's dispositive motion. On August 18, 2014, Plaintiff filed a motion for leave to file excess pages in her response to Defendant's dispositive motion, along with a motion to file another supplemental or amended medical expert affidavit. The motion to exceed the page limits was granted by Order entered on August 21, 2014. By separate Order entered the same day, Defendant was directed to file a response to Plaintiff's motion seeking to amend or supplement her expert's affidavit. On September 19, 2014, Defendant filed its response in opposition to Plaintiff's motion for leave to file a supplemental certificate of merit.

This matter is before the undersigned for review and report and recommendation pursuant to LR PL P 2, 28 U.S.C. §§1915(e) and 1915A.

## I. The Pleadings

### A. The Complaint

In her complaint, Plaintiff alleges that on or about March 31, 2010, she slammed her left middle finger in her cell door at SFF Hazelton, injuring it. According to the complaint, Plaintiff sustained two lacerations, one on either side of the fingertip, and was initially seen by Jamie Hamilton, RN, who referred her to the on-duty medical doctor, Janet Shackelford, M.D. ("Shackelford"). An x-ray was performed, revealing a distal phalangeal fracture. Dr. Shackelford

did not suture the wound, but instead rinsed the wound, cleaned it with Betadine, applied Bacitracin and wrapped the finger with sterile gauze. Although a splint was not applied that day, one was ordered for the following day's dressing change. On April 1, 2010, Plaintiff returned to the medical unit where she was seen by Physician's Assistant ("PA") Alicia Wilson, who determined that the skin around the wound was "dying" and it was medically necessary to suture the wound to keep Plaintiff from losing her entire fingertip. PA Wilson utilized five sutures to close the wound. A splint was still not available so a hard plastic protective covering was placed over the finger. The sutures were to be removed in seven (7) days, or by April 8, 2010, but they were not removed until April 13, 2010. Plaintiff alleges that by then, the skin had begun to grow around the sutures and they had to be forcibly removed, causing her further pain and suffering.

Three months later, on July 14, 2010, Plaintiff was transferred to FPC Marianna in Marianna, Florida.

Plaintiff maintains that on January 10, 2011, she met with Mid-Level Practitioner ("MLP") Abad at FPC Marianna, who ordered an x-ray of her finger. Plaintiff indicates that the x-ray was read as abnormal reflecting a distal tuft fracture with a 2mm displaced fragment. On January 21, 2011, Plaintiff had a follow-up appointment with MLP Abad, who discussed with her that the wound was old and she did not think they would do anything at FPC Marianna, but she would schedule her for an appointment with Dr. Toledo. Plaintiff indicates that she saw Dr. Toledo on May 26, 2011, and they discussed the condition of her finger and her remaining options. Plaintiff alleges that Dr. Toledo explained that, in its current state, the finger would require surgical repair and it would cause her more pain than she was currently experiencing.

As grounds for relief, Plaintiff alleges:

> 1. Dr. Shackelford was medically negligent when she failed to prescribe pain medications to effectively control her pain.

3

2. Dr. Shackelford's decision not to suture her finger constituted medical negligence and a breach of the prevailing professional standard of care.

3. Dr. Shackelford and PA Wilson's failure to immobilize her fingertip was medical negligence and a breach of the prevailing professional standard of care.

4. Dr. Shackelford and PA Wilson's failure to refer her to an orthopedic specialist constitutes medical negligence and a breach of the prevailing professional standard of care.

5. As a direct and proximate result of the combined negligence of the government, its agents, servants, and employees, she has suffered with an improperly healed finger, displaced bone fragments, limited range of motion, deformity of her finger, and has become, as a direct and proximate result, disfigured. As a result of her injuries, she has suffered pain of mind and body, permanent disability and disfigurement, and has been damaged in the aggregate sum of at least $2,840,000.00.

6. As a result of these injuries, she will incur future medical expenses, will lose earnings, will suffer pain of mind and body and will be permanently disabled and disfigured, will suffer a substantial loss of earning capability and will suffer post-traumatic arthritis in her hand, all in the total sum of $2,200,000.00.

Accordingly, Plaintiff requests a total of $5,040,000.00 in damages.

## B. **Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

Defendant asserts that it is entitled to summary judgment and Plaintiff's complaint should be dismissed because Plaintiff failed to meet the statutory requirements of West Virginia Code §55-7B-6(b).

## C. **Plaintiff's Response**

Plaintiff reiterates her arguments and attempts to refute Defendant's on the same.

## II. **Standard of Review**

## A. **Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is

inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8 (providing general rules of pleading), Fed. R. Civ. P. 9 (providing rules for pleading special matters), Fed. R. Civ. P. 10 (specifying pleading form), Fed. R. Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed. R. Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe her pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

**B. Motion for Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that "the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

### III. Analysis

#### A. Failure to State a Claim

The FTCA waives the federal governments' traditional immunity from suit for claims based on the negligence of its employees. 28 U.S.C. §1346(b)(1). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001).

Because all of the alleged negligent acts occurred in West Virginia, the substantive law of West Virginia governs this case.

**1. <u>Medical Negligence</u>**

To establish a medical negligence claim in West Virginia, Plaintiff must prove:

(a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code §55-7B-3. When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. <u>Banfi v. American Hospital for Rehabilitation</u>, 529 S.E.2d 600, 605-06 (2000).

Additionally, under the West Virginia Medical Professional Liability Act ("MPLA"), certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides in pertinent part:

**§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions.**

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable

standard of care resulted in injury or death. A separate screening certificate of merit
must be provided for each health care provider against whom a claim is asserted.
The person signing the screening certificate of merit shall have no financial interest
in the underlying claim, but may participate as an expert witness in any judicial
proceeding. Nothing in this subsection may be construed to limit the application of
rule 15 of the rules of civil procedure.

"[T]he purposes of requiring a pre-suit notice of claim and screening certificate of merit
are (1) to prevent the making and filing of frivolous medical malpractice claims and lawsuits; and
(2) to promote the pre-suit resolution of non-frivolous medical malpractice claims." Hinchman v.
Gillette, 618 S.E.2d 387, 394 (W.Va. 2005). This Court previously held that compliance with
W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United
States, 321 F.Supp.2d 805, 806-07 (N.D. W.Va. 2004).[4]

This civil action is the second of three cases Plaintiff has filed regarding the same March
31, 2010, left middle finger injury in this district.[5] This time, Plaintiff alleges that the United
States, through the actions of its employees, Janet Shackelford, M.D. and Alicia Wilson, P.A.,
committed medical negligence, causing her permanent injury and damages. Plaintiff's claims in
this action are without merit.

A review of Plaintiff's BOP medical records[6] attached to Defendant's dispositive motion
in her Bivens action over this same injury[7] indicate that Plaintiff was seen at USP Hazelton's
Health Services for her finger injury four times between March 31 and April 13, 2010. She was

---

[4] In Stanley, Plaintiff brought suit against the United States alleging that the United States, acting through its employee
healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

[5] See Jacobs v. Wilson, Civil Action No. 5:12cv137 (N.D. W.Va. July 18, 2013) Bivens action dismissed for failure
to exhaust, and Jacobs v. Wilson, Civil Action No. 3:13cv89 (N.D. W.Va. July 24, 2014), Bivens action dismissed for
failure to state a claim upon which relief can be granted.

[6] The parties in the instant action have produced some of Plaintiff's medical records, but because they are incomplete,
the undersigned will rely on the more complete records medical produced in Plaintiff's other cases.

[7] 3:13cv89 (N.D. W.Va. July 24. 2014).

initially seen in Hazelton's Health Services by Jamie Hamilton, RN at 12:10 p.m. on March 31, 2010. Visual examination of the wound that day revealed "mild bleeding to the tip of the R [sic] middle digit.[8] A laceration is present running under the nail bed and around to the pad of the finger. I/M referred to MD for evaluation of need for sutures."[9]  Plaintiff was then seen at 12:56 p.m. by Dr. Shackelford, who commented

> [w]ound edges fairly well approx[imated][.] as bone broken and risk of infection[,] will not place sutures (foreign body) and will start Bactrim antibiotics prophylactically. Inmate will follow up tomorrow and until wound starts to heal. Warning sx [symptoms] of infection given to inmate to immed[iately] come or have co [correctional officer] call to HS [health services].[10]

Dr. Shackelford then elaborated on her findings:

> [i]nmate smashed her hand in a door. Cut skin and small amount bleeding very painful. Xray [sic] shows distal phalange fractured.  Cut dorsal part of finger to below nail and small lacation [sic] palm surface of distal 1st finger.  Cut was clean and min[imal] bleeding. Due to proximity of fractured bone[,] will not place stitch to avoid foreign body and decrease chance of infection.  Wound rinsed for 5 minutes[,] cleaned with betadine[,] then bacitracin ointment [applied] and wrapped with sterile guaze [sic] the 4x4s [sic].  No splint avail will obtain for tomorrow's dressing change.  Start bactrim DS BID and Motrin.  2008 had tetanus shot.
>      . . .
> Follow up to HS daily for check and dressing change until staff stops visits.  Return immed[iately] if fever, increased swelling, bleeding, redness [sic], drainage warmth occurs.[11]

Plaintiff was seen in Health Services again at 9:33 a.m. on April 1, 2010, by PA Wilson.

Wilson noted in pertinent part:

> [i]nmate seen yesterday.  She apparently shut her finger in her cell door.  Xray was taken yesterday with a DIP fracture (I think??) [sic].  She returned today for re-evaluation.  She had 2 lacerations on either side of left middle finger, out from nail.

---

[8] It is the left middle finger that was injured, not the right.

[9] 3:13cv89, Dkt.# 33-2 at 2.

[10] 3:13cv89, Dkt.# 33-2 at 3.

[11] 3:13cv89, Dkt.# 33-2 at 4 – 5.

They did require suturing.[12]  The lacerations were cleaned with povidine first, as the injury occurred yesterday.  I then injected 0.2cc %1 Lidocaine into each laceration.  I cleaned the wounds again.  I then placed 2 interrupted sutures in one laceration and 3 in the other with 6-0 nylon.  Her finger was then placed in a protected finger covering and wrapped.  She tolerated the procedure well, there were no complications.[13]

Wilson also prescribed Tylenol 300 mg with Codeine 30 mg twice daily for three days for pain; the first dose was given in the Clinic at 9:00 a.m.[14]

Plaintiff was seen again on April 5, 2010; at that visit, PA Wilson noted "[f]inger looks great. Healing well.  Requesting a few more days pain meds.  Dr. Shackelford Ok'd."[15]  Plaintiff received a prescription for three more days of Tylenol with Codeine, at the same dose and schedule previously given.[16]

On April 13, 2010, Plaintiff returned to Health Services; she was seen again by PA Wilson, who noted

[h]ere today for suture removal.  Had sutures placed 4/1 on left middle finger after she slammed finger in a door.  She says she is feeling much better. Pain is better. Pain Location: Finger(s)-Left.  Pain Scale: 5. Pain Qualities: Aching . . . Skin on finger looks great. No erythema, no discharge.  Sutures removed. . . Follow-up at Sick Call as Needed.[17]

---

[12] PA Wilson's sworn Declaration elaborates on this point:  "I saw Plaintiff the following day, April 1, 2010, and determined that the wound had not improved and should be sutured. I sutured the wound, provided Plaintiff with pain medication, and provided a hard protective covering for the finger." 3:13cv89, Dkt.# 33-3 at 3.

[13] 3:13cv89, Dkt.# 33-4 at 9.

[14] 3:13cv89, Dkt.# 33-4 at 9.

[15] 3:13cv89, Dkt.# 33-4 at 12.

[16] 3:13cv89, Dkt.# 33-4 at 12.

[17] 3:13cv89, Dkt.# 33-4 at 14.

PA Wilson's sworn Declaration, submitted in the <u>Bivens</u> action filed over this same injury, notes that "[a]fter this date, Plaintiff never returned to Health Services for regarding [sic] any complaints about her finger, and on July 6, 2010 she transferred to another institution."[18]

Plaintiff has filed other <u>Bivens</u> actions relating to a stress fracture in her right lower leg.[19] The medical records produced by Defendants in those proceedings reflect that Plaintiff was seen by Health Services at USP Hazelton and FPC Marianna more than 16 times for various reasons between June 24, 2010 and September 13, 2011. In a Health Intake Assessment performed on July 6, 2010, incident to Plaintiff's transfer to FPC Marianna, when asked "do you currently suffer from any painful condition?" Plaintiff responded "Yes. Head. Also pain in teeth or mouth."[20] There was no mention of left finger pain. She was also seen in Health Services at FPC Marianna by MLP Abad for a complete physical exam on July 27, 2010; at that time, she reported her only current painful conditions were "right lower leg injury in 05-2010 doing aerobic exercises[.] Left lower leg hematoma n [sic] 07-26-2010 whlie [sic] pulling the garbage, the garbage container hit left lower leg."[21] The examiner further noted that she had no body deformities[22] and no visible problem with her fingernails on extremity exam.[23]

---

[18] 3:13cv89, Dkt.# 33-3 at 3.

[19] Plaintiff has also filed four cases over the same May 2010 stress fracture injury to her right lower leg: <u>Jacobs v. Abad</u>, 5:12cv363 (N.D. Fla. Feb. 25, 2014) (<u>Bivens</u> action dismissed for failure to state a claim); <u>Jacobs v. United States</u>, 5:13cv69 (N.D. W.Va. Apr. 14. 2014)(FTCA dismissed for failure to state a claim and warned of three-strike rule), *aff'd.* No. 14-6676 (4th Cir. Sep. 30, 2014); <u>Jacobs v. United States</u>, 5:13cv278 (N.D. Fla.) (FTCA transferred to N.D. W.Va. on Jan. 10, 2014); <u>Jacobs v. Wilson</u>, 1:12cv131 (N.D. W.Va. Dec. 16, 2013) (<u>Bivens</u> action dismissed for failure to state a claim and for failure to exhaust); and <u>Jacobs v. United States</u>, 5:14cv4 (N.D. W.Va.) (FTCA action transferred from N.D. Fla. to this district on Jan. 10, 2014 and transferred back again on October 16, 2014, where it is still pending, now as Civil Action No. 5:14cv269).

[20] 1:12cv131, Dkt.# 32-3 at 3-5.

[21] 1:12cv131 Dkt.# 32-3 at 11.

[22] 1:12cv131, Dkt.# 32-3 at 12 and Dkt.# 32-3 at 19.

[23] 1:12cv131, Dkt.# 32-3 at 19.

Plaintiff did not file a request with the BOP for an informal resolution (BP-8) related to her left middle finger injury until December, 2010, over eight months post-injury. In that BP-8, she stated "I severely cut and broke the tip of my middle L finger at Hazelton FCI in W. Virginia" and she requested "reconstructive and rehabilitative treatment and services."[24] In a December 13, 2010 response, her counselor advised "[o]ld injury to finger – Medical provider has ordered xray [sic] to ensure proper healing."[25]

Thereafter, Plaintiff's first post-initial-injury complaint related to her left middle finger injury, made to any BOP healthcare provider, was made at a January 10, 2011 Health Services visit at FPC Marianna, when she was seen by MLP Abad, almost 9 months since the April 13, 2010 suture removal. The record of that encounter indicates she presented for several complaints, one of which was pain in her finger. On exam, with respect to her "Wrist/Hand/Fingers," she was found to have full range of motion; normal active range of motion; normal passive range of motion; and the neurovascular supply to the area was intact. In addition, she had no joint deformity; malalignment; swelling; ecchymosis; erythema; or tenderness.[26] An x-ray performed on January 13, 2011 did reveal her old distal tuft fracture with a 2 mm displaced fragment.[27] She was already taking Indomethacin for a right lower leg injury; no further medication was ordered.

On May 16, 2011, Plaintiff filed a BP-9, requesting to talk to an orthopedic specialist to evaluate her damaged left middle finger.[28]

---

[24] 3:13cv89, Dkt.# 18-1 at 4.

[25] 3:13cv89, Dkt.# 18-1 at 4.

[26] 1:12cv131, Dkt.# 32-3 at 39-40.

[27] 1:12cv131, Dkt.# 32-3 at 45-46.

[28] 3:13cv89, Dkt.# 18-1 at 5.

The record of a May 26, 2011 examination at FPC Marianna, "to be evaluated on an old injury" by a "Dr. Toledo" indicates that Plaintiff's left middle finger had an old healed scar with numbness at the distal medial side; no pain from the distal tip of the finger, but "some pain when pressing the fingertip."[29] Dr. Toledo documented that he advised Plaintiff that there was nothing to be done for the fractured distal tuft; she was advised to "continue exercising the motion of the fingertip;" and that Plaintiff "expressed understanding everything explained."[30]

On June 3, 2011, the Warden denied Plaintiff's BP-9 remedy request regarding her finger, stating in pertinent part, that:

> [y]ou were evaluated on May 26, 2011, by the Clinical Director here at FCI Marianna, due to your continued concerns regarding your finger. The Doctor reviewed your medical record regarding this injury and evaluated the current status of your finger. He advised there is no other treatment recommended for your finger. He counseled you on exercising your fingertip to help increase motion and flexibility.[31]

Although Plaintiff was seen three times thereafter in Health Services for various complaints through September 13, 2011, when the available medical records end, there was never any further mention of finger pain; her finger injury; or any request for additional treatment for it.[32]

On October 6, 2011, Plaintiff filed a Regional Administrative Remedy Appeal (BP-10), again requesting to see and talk to an orthopedic specialist about her finger. She received a denial of that remedy on December 27, 2011, which noted that:

> [y]our sutures were removed on April 13, 2010, and you indicated you were feeling much better. You did not voice any further complaints of pain in your injured finger until your Hypertension Chronic Care Clinic encounter on January 10, 2011, at

---

[29] 1:12cv131, Dkt.# 32-3 at 57.

[30] 1:12cv131, Dkt.# 32-3 at 57.

[31] 3:13cv89, Dkt.# 18-1 at 5.

[32] 1:12cv131, Dkt.# 32-3 at 58 – 67.

which time your pain medication was renewed[33] . . . **On May 26, 2011, the Clinical Director reviewed the results of an x-ray of your left third finger conducted on January 12, 2011 [sic]. The x-ray showed a 2mm fragment from fracture of the distal tuft. The Clinical Director examined your finger and subsequently explained that your condition does not require any further treatment** . . . you received appropriate treatment in accordance with your clinical presentation. Your condition does not warrant an orthopedic consultation.

Dkt.# 18-1 at 8 (emphasis added).

## Negligence Claims Against Dr. Janet Shackelford

Plaintiff alleges that Shackelford was medically negligent by failing to suture her finger; failing to immobilize or provide a splint for the finger, failing to prescribe effective pain medications to control her pain, and by failing to refer her to an orthopedic specialist. However, the record and the facts admitted by Jacobs reveal that Plaintiff received prompt and appropriate medical care from Shackelford.

Shackelford's March 31, 2010 notes set forth a reasonable medical rationale for the initial decision not to suture: the wound edges were already fairly well approximated, and because the bone fragment was present and the skin broken, she wanted to avoid increasing the risk of infection by placing the "foreign body" of a suture so close to the bone fragment. Instead, after thoroughly cleaning and dressing the wound and starting prophylactic antibiotics, Shackelford scheduled follow up wound care for the next day.[34] Shackelford's sworn declaration on this point in the Bivens action filed over the same injury states "[a]lthough . . . [Plaintiff] had some bleeding, it was minimal; and as the wound was not clean, I chose to delay stitching her finger to observe for signs of infection . . . The wound edges were well approximated at that time."[35] Likewise, there is

---

[33] The medication that was renewed at that visit was Indomethacin, a non-steroidal anti-inflammatory ("NSAID") prescribed for pain from her R lower leg stress fracture. Dkt.# 32-3 at 41.

[34] 3:13cv89, Dkt. # 33-2 at 3 - 6.

[35] 3:13cv89, Dkt.# 33-1 at 2.

nothing in the medical records to support Plaintiff's claim that PA Wilson determined that the skin around the wound was "dying" the next day, thus requiring sutures "to keep plaintiff from losing her entire fingertip," let alone that PA Wilson "did not understand why Dr. Shackleford [sic] had not placed sutures on her finger the day before because it was obvious that they were needed."[36] Setting aside for the moment the implausibility of tissue necrosis being evident so soon, the undersigned finds that this claim, in addition to being unsupported in the record, is suspect, because the treatment for necrotic skin would not be sutures, it would be wound debridement.[37] In any event, while Wilson's April 1, 2014 note does not specifically state why the lacerations "did require suturing,"[38] her sworn declaration in the Bivens action states that when she saw the wound that day, it "had not improved, and [needed to] . . . be sutured." [39] The undersigned construes this statement to indicate that local swelling in the area may have caused the wound edges to separate, finally necessitating closure with suture.

Plaintiff's next claim, that Shackelford was negligent in treating her finger injury because she did not provide her with "an immobilizing device" for her finger, likewise lacks support in the record. Shackelford's sworn declaration in the Bivens action states that "[d]ue to the location of the fracture, neither surgery nor a splint was medically warranted as the fracture was only two millimeters from the tip of the finger, and her finger's mobility was unaffected."[40] Despite the fact that a splint was not medically required, Shackelford's March 31, 2010 note states that because no

---

[36] Dkt.# 1, ¶5 at 9.

[37] See http://endoflifecare.tripod.com/imbeddedlinks/id3.html

[38] 3:13cv89, Dkt.# 33-4 at 9.

[39] 3:13cv89, Dkt.# 33-3 at 3.

[40] 3:13cv89, Dkt.# 33-1, ¶3 at 2.

splint was available the day Plaintiff was injured, one would be obtained for Plaintiff's dressing-change-visit the following day. Plaintiff herself admits that "[a] splint, was, however, was ordered [by Shackelford] for the following days' [sic] dressing change,"[41] and despite her claim that "there was still no splint available"[42] the next day, she admits that a "hard plastic, protective covering"[43] was applied, likely at Shackelford's order, by PA Wilson, after she sutured and re-dressed the wound. Nonetheless, a splint is not even mandated for the treatment of a tuft fracture.[44]

Plaintiff's next claim, that Shackelford was negligent because she did not provide "effective pain controlling medications" likewise fails to state a claim of medical negligence. On the day of the injury, Shackelford did prescribe Motrin, a non-steroidal anti-inflammatory, at its maximum dose of 800 mg, three times daily for pain.[45] The next day, Shackelford approved PA Wilson's prescription of Tylenol with Codeine;[46] Plaintiff received her first dose at 9:00 a.m. in Clinic, before she was seen by PA Wilson.[47] Four days later, Shackelford renewed the Tylenol with Codeine prescription when PA Wilson notified her that Plaintiff requested it.[48] Moreover, Plaintiff's claim that she "suffered for months"[49] with her finger injury is belied by her own

---

[41] Dkt.# 1-2, ¶3 at 2.

[42] Dkt.# 1-2, ¶5 at 2.

[43] Dkt.# 1, ¶6 at 9.

[44] ". . . 8. The patient *may* wear a protective splint or bulky dressing over the fingertip and distal interphalangeal (DIP) joint to prevent movement. The splint also protects the finger from accidental reinjury. However, do *not* immobilize the entire finger with the dressing or splint. Complete immobilization leads to unnecessary finger stiffness. 9. Once the finger is less tender (usually within 10–14 days), encourage the patient to gradually resume normal use of the finger." See http://practicalplasticsurgery.org/docs/Practical_30.pdf (emphasis added).

[45] 3:13cv89, Dkt.# 33-2 at 4 – 6.

[46] 3:13cv89, Dkt.# 33-4 at 9.

[47] 3:13cv89, Dkt.# 33-4 at 9.

[48] 3:13cv89, Dkt.# 33-4 at 12.

[49] 3:13cv89, Dkt.# 1 at 7.

medical records, which show that at the April 13, 2010 visit, she reported to PA Wilson that she was "feeling much better. Pain is better."[50] She never returned to Hazelton's Health Services again requesting any treatment for the finger, before transferring out of Hazelton on July 6, 2010.[51] Furthermore, on July 6, 2010[52] and July 27, 2010,[53] when questioned as to whether she currently had any painful condition anywhere in her body, she never reported any finger pain; and she never returned to Health Services for any finger-related complaint at all until nine months after the stitches were removed[54] which coincidentally, was one month after the BP-8 she finally filed on the issue was first denied. The only pain-related findings in her May 26, 2011 examination at FPC Marianna were some numbness of her old healed scar at the distal medial side; no pain from the distal tip of the finger, but "some pain when pressing the fingertip."[55] The records available to the undersigned do not indicate that Plaintiff ever complained of left middle finger injury pain to any health provider again.

The undersigned notes that Plaintiff alleges that on "1-21-11 [sic]," medical staff at FPC Marianna indicated that the care she received at FCC Hazelton should have included a splint or other "bone immobilization device," referral to an orthopedic specialist, and surgery, to help the

---

[50] 3:13cv89, Dkt.# 33-4 at 14.

[51] 3:13cv89, Dkt.# 33-3 at 3; Dkt.# 33-4 at 6.

[52] 1:12cv131  Dkt.# 32-3 at 3 – 5.

[53] 1:12cv131 Dkt.# 32-3 at 11.

[54] 1:12cv131, Dkt.# 32-3 at 39 – 40.

[55] 1:12cv131, Dkt.# 32-3 at 57.

distal tuft fracture heal properly. However, a review of those medical records indicates no such statements by any provider.[56]

Nor does Plaintiff's claim that Shackelford was negligent for not referring her to an orthopedic specialist constitute negligence. Shackelford's evaluation of the fracture indicated that because of the tiny size of the two millimeter fracture fragment, and its location, only two millimeters from the fingertip, neither surgery nor a splint was medically indicated. Dr. Toledo, the Clinical Director at FPC Marianna, concurred. The conclusion to be drawn, therefore, is that the fracture was so minor it did not warrant an orthopedic consult because orthopedic surgery is not indicated for a tuft fracture.[57]

Here, Plaintiff fails to point to a single act or omission by Shackelford which rises to the level of medical negligence.

**Medical Negligence Claims Against PA Wilson**

Plaintiff claims that PA Wilson was negligent for failing to immobilize her fingertip and failing to refer her to an orthopedic specialist.

Plaintiff's first claim, that Wilson negligently failed to provide her with "a splint or other immobilizing device" lacks support in the record and contradicts Plaintiff's own claims in the complaint. While Dr. Shackelford's March 31, 2010 note does state that no splint was available the day Plaintiff was injured, it specified that one would be obtained for Plaintiff's dressing-change-visit the following day. As promised, the next day, PA Wilson had available and did apply a hard plastic protective covering to Plaintiff's finger after suturing and re-dressing the wound.[58]

---

[56] The dates she was seen at FPC Marianna for her finger were January 10 and 23, and May 26, 2011. See 1:12cv131, Dkt.# 32-3 at 39-40, 45-47, and 57.

[57] See http://practicalplasticsurgery.org/docs/Practical_30.pdf

[58] Dkt.# 33-4 at 9; Dkt.# 33-3 at 3.

Plaintiff's insistence that no actual "splint" was ever given is a distinction without a difference; it is clear that the "hard plastic covering" was an "immobilization device" intended to stabilize the fracture and protect the fingertip from further injury until it healed. Moreover, even if no splint or "immobilization device" had ever been given, it would not change this analysis, because as noted *supra,* a splint is not a mandated requirement in the treatment of a tuft fracture.

Although not actually raised as a claim in the instant complaint, in Plaintiff's attached memorandum, she alleges that Wilson left her stitches in too long, because they were left in for twelve instead of seven days, requiring them to be "removed forcefully," causing "further pain and suffering." This claim, likewise lacks support in the record. The medical record of the day of suture removal indicates that the skin on the finger "looks great. No erythema, no discharge. Sutures removed."[59] Moreover, this claim has no merit because "[d]ifferent parts of the body require suture removal at varying times. . . [and] times vary according to the health care professionals that perform the procedure." Sutures in extremities are commonly removed in ten - fourteen days.[60]

Finally, Plaintiff's claim that Wilson was negligent because she did not refer Plaintiff to an orthopedic specialist likewise fails to state a claim. Not only was an orthopedic consult unwarranted, but because PA Wilson is only a physician's assistant and not a medical doctor, it is unlikely that she even had the authority to refer Plaintiff to an outside specialist.

Despite her allegations, Plaintiff fails to point to a single act or omission by Wilson which is sufficient to constitute medical negligence.

---

[59] Dkt.# 33-4 at 14.

[60] See http://www.emedicinehealth.com/removing_stitches/page2_em.htm

Although Plaintiff insists that her medical treatment was inadequate and that she has been rendered permanently disfigured "with limited range or motion,"[61] her claims, like those in her previous Bivens action on this same injury, are contradicted by her July 27, 2010 physical, which showed no visible problem with her fingernails on an extremity exam;[62] and musculoskeletal exams performed on her left hand on January 10 and 23, 2011, showing that her wrist, hand, and fingers had full range of motion; normal active and passive range of motion; her neurovascular supply was intact; and she had no joint deformity, malalignment, swelling, ecchymosis, erythema, or tenderness.[63] Further, despite Plaintiff's dogged insistence that her medical treatment was inadequate, it is apparent from the available record that Plaintiff rarely sought treatment for her finger after the initial injury period; often denied pain when queried; and had no visible disability or limitation from the injury.

Accordingly, Plaintiff has failed to prove that either Shackelford or Wilson failed to exercise the degree of care, skill, and learning required of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs, acting in the same or similar circumstances; let alone that such failure was a proximate cause of any injury to her.[64]

**Sufficiency of Screening Certificates**

Finally, with regard to Defendant's objections to the technical sufficiency of Plaintiff's screening certificate(s)[65] in establishing the appropriate standard of care, while the undersigned

---

[61] Dkt.# 1-2, ¶10 at 2.

[62] 1:12cv131 Dkt.# 32-3 at 19.

[63] 1:12cv131, Dkt.# 32-3 at 39 - 40 and  45 – 46.

[64] W.Va. Code §55-7B-3.

[65] Defendant's motion to dismiss contends that the initial screening certificate of merit (Dkt.# 19-3) 1) fails to establish with particularity chiropractor Jenkins' qualifications or familiarity with the applicable standard of care in issue; 2) fails to include  Jenkins' opinion as to how the BOP providers breached the applicable standard of care and 3) fails to

agrees that the sworn affidavit by the chiropractor Jenkins, even in its amended form, is deficient in many ways,[66] the undersigned must find that Defendant waived its objections to it by failing to specifically raise them in a pre-suit response to Plaintiff's screening certificate. See Hinchman v. Gillette, 618 S.E.2d at 395 (to preserve objections to the legal sufficiency of a screening certificate, a healthcare provider must respond within thirty days of receiving the certificate). Plaintiff has provided proof, albeit untimely proof, that her Notice of Claim and screening certificate were sent to both Shackelford and PA Wilson by certified mail, return receipt requested, on May 10, 2013,[67] 41 days before she deposited her complaint into the prison's mail system on June 20, 2013[68] and 49 days before the case was filed on June 28, 2013. Plaintiff also provided proof that PA Wilson received her notice and screening certificate on May 14, 2013;[69] and a search of the United States Postal Service's online tracking indicates that Dr. Shackelford's arrived the same day. Defendant does not deny that its employees received the screening certificates or contend that either timely objected before suit was filed. Moreover, West Virginia law does not support such a harsh remedy such as dismissal for technical violations of the screening certificate, when a plaintiff acts in good faith, attempting to comply with the statutory purposes of the pre-suit requirements. See Cooper v. Appalachian Reg'l. Healthcare, Inc., 2006 U.S. Dist. LEXIS 19247 * 7 - 8 (S.D. W.Va. March

---

[66] include Jenkins' opinion as to how the alleged breach in the standard of care resulted in plaintiff's injury. Further, Defendant argues that the steps Jenkins claims should have been taken by the BOP in treating Plaintiff's finger are exactly the steps that were taken. While Defendant does not address the amended affidavit (Dkt.# 32) in its Response to Plaintiff's Motion for Leave to File a Supplemental/Amended Certificate of Merit (Dkt.# 60), Defendant does note that the pending motion seeking to amend/supplement the affidavit for the second time should be denied as futile, because the proposed supplemental affidavit merely includes opinions regarding Plaintiff's leg and back, not at issue in this case.

[66] Because the undersigned is of the opinion that no medical negligence occurred, there is no purpose in undertaking a detailed analysis of all of the deficiencies in Plaintiff's initial or first supplemental screening certificate of merit.

[67] Dkt.# 19-2 at 2.

[68] Dkt.# 1-3 at 1.

[69] Dkt.# 19-2 at 2.

3, 2006) (denying defendants' motions to dismiss insofar as dismissal was sought for deficiencies in plaintiff's pre-suit screening certificate, which was unsworn, prepared by a registered nurse unqualified to give an expert opinion as to the cause of plaintiff's death; not served to all defendants; and failed to disclose the names of all defendants). The West Virginia Supreme Court of Appeals has made it clear that the MPLA is not intended to restrict access to the courts or create an opportunity for gamesmanship. Hinchman, 618 S.E.2d at 394. Under the circumstances, with Plaintiff being a prisoner, it is clear she made a diligent effort to comply with the MPLA's pre-suit requirements. Unfortunately, however, while it is understandable why no pre-suit resolution of this case occurred, the remaining statutory purpose of the MPLA's pre-suit requirements of preventing frivolous claims has been thwarted nonetheless.

Finally, the undersigned notes that had this case had sufficient merit to survive Defendant's dispositive motion, Jenkins, as a chiropractor, would certainly not be qualified to render an opinion as to Shackelford's or Wilson's alleged negligence at trial, because he/she fails to meet the requirements of W.Va. Code §55-7B-7.

## IV. <u>Recommendation</u>

For the reasons set forth above, it is recommended Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Dkt.# 39) be **GRANTED** and that Plaintiff's Complaint be **DISMISSED with prejudice as frivolous and for failure to state a claim upon which relief can be granted.**

Further, the undersigned recommends that Plaintiff's pending Motion for Leave to File an [sic] Supplement, or Amended Medical Expert Sworn Affidavit (Dkt.# 54) be **DENIED as moot**.

**Within fourteen (14) days** after being served with a copy of this recommendation**,** any party may file with the Clerk of Court written objections identifying those portions of the

recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208.

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to her last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

Date: January 16, 2015

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE