**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**CHRISTINA JACOBS,**

Plaintiff,

v.

**CIVIL ACTION NO.: 1:13-CV-164**
**(KEELEY)**

**UNITED STATES OF AMERICA,**

Defendant.

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

On June 26, 2013, Plaintiff Christina Jacobs ("Plaintiff"), acting *pro se*, filed a Complaint against Defendant the United States of America ("Defendant"), alleging medical negligence[1] and seeking relief under the Federal Tort Claims Act ("FTCA"). (Compl., ECF No. 1). On July 3, 2013, Plaintiff was granted leave to proceed *in forma pauperis* and directed to pay an initial partial filing fee (ECF No. 6); Plaintiff paid the required fee on August 12, 2013.

On September 3, 2013, upon initial review, Magistrate Judge David Joel issued a Report and Recommendation ("R&R"), recommending that Plaintiff's Complaint be dismissed for failure to state a claim upon which relief could be granted and as frivolous. (ECF No. 14). Plaintiff timely objected, attached copies of some of her medical records and, for the first time, copies of an unsigned Notice of Claim and a screening certificate of merit.[2] (ECF No. 19-3 at 3). On September 26, 2013, Plaintiff filed a motion to supplement or amend her medical affidavit. (ECF No. 20). By Order entered May 2, 2014, the September 3, 2013, R&R was declared moot

---

[1] The Complaint did not attach a Notice of Claim or a screening certificate of merit from a medical expert.

[2] The certificate was dated April 13, 2013, and was provided by a South Carolina chiropractor, Cherron Jenkins, D.C. ECF No. 19-3 at 1-2.

and the case was recommitted to the magistrate judge[3] with instructions to reconsider the Complaint in light of the documents filed after the R&R was entered. (ECF No. 29). By separate Orders entered May 15, 2014, Plaintiff's motion to amend/correct her medical affidavit was granted, the supplement to the medical expert's affidavit was filed and Defendant was ordered to answer the Complaint. (ECF Nos. 31, 32, 33). A summons was issued for Defendant that day.

On July 8, 2014, Defendant filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. (ECF No. 39). Because Plaintiff was proceeding *pro se*, a <u>Roseboro</u> Notice was issued, advising Plaintiff of her right to file a response to Defendant's dispositive motion. (ECF No. 42). On August 18, 2014, Plaintiff filed a motion for leave to file excess pages in her response to Defendant's dispositive motion (ECF No. 53), along with a motion to file another supplemental or amended medical expert affidavit. (ECF No. 54). The motion to exceed the page limits was granted by Order entered on August 21, 2014. (ECF No. 55). By separate Order entered the same day, Defendant was directed to file a response to Plaintiff's motion seeking to amend or supplement her expert's affidavit. (ECF No. 57). On September 19, 2014, Defendant filed its response in opposition to Plaintiff's motion for leave to file a supplemental certificate of merit. (ECF No. 60).

On January 16, 2015, the undersigned issued an R&R, recommending that Defendant's dispositive motion be granted and that Plaintiff's FTCA action be dismissed with prejudice as frivolous and for failure to state a claim upon which relief could be granted. (ECF No. 62). Plaintiff timely objected. On March 19, 2015, the Court entered a Memorandum Opinion and

---

[3] At the time, the matter was recommitted to Magistrate Judge James Seibert, because Magistrate Judge David Joel had retired and had not yet been replaced by the undersigned.

Order, addressing Plaintiff's objections, dismissing one claim,[4] denying the Government's dispositive motion, granting Plaintiff's motion for leave to supplement, adopting in part and declining to adopt in part the R&R, and recommitting the matter to the undersigned. (ECF No. 65).

A Scheduling Order was entered on April 30, 2015. (ECF No. 68). On May 11, 2015, Plaintiff filed a documented titled RE: MEMORANDUM OPINION AND ORDER. (ECF No. 71).[5] On May 29, 2015, Plaintiff filed a Motion for Enlargement of Time in which to provide her Independent Medical Exam ("IME") and Expert Disclosure. (ECF No. 72). By Order entered June 2, 2015, the motion was granted. (ECF No. 73). On June 19, 2015, Plaintiff filed a notice of change of address, indicating that she was out of prison. (ECF No. 75). The parties began exchanging written discovery. On July 7, 2015, Defendant moved for an extension of time for the Scheduling Order deadlines. (ECF No. 77). By Order entered July 8, 2015, Defendant's motion was granted and an Amended Scheduling Order was entered. (ECF No. 78). On September 28, 2015, Plaintiff filed a request for mediation and a request for an amended scheduling order. (ECF Nos. 81, 82). By Order entered September 30, 2015, the motions were denied. (ECF No. 84). On October 26, 2015, Plaintiff filed a motion titled "RE: MEDIATION" requesting a date for mediation. (ECF No. 86). By Order entered November 2, 2015, the motion was denied. (ECF No. 88). By Order entered by Magistrate Judge James E. Seibert, mediation was scheduled for November 24, 2015. (ECF No. 89). On November 18, 2015, by joint motion, the parties moved to continue mediation. (ECF No. 92). By Order entered November 20, 2015,

---

[4] The Court dismissed Plaintiff's claim that Dr. Shackelford was negligent for failing to prescribe sufficient pain medication.

[5] In Plaintiff's "MEMORANDUM OPINION AND ORDER," she advised that she would be released from prison soon and expressed hope that the case would move forward quickly.

the joint motion to continue mediation was granted in part. (ECF No. 93). By Order entered November 24, 2015, mediation was rescheduled. (ECF No. 95). Discovery closed on November 30, 2015. On December 18, 2015, Defendant filed some of Plaintiff's medical records, along with a motion to seal them. (ECF No. 97). By Order entered December 21, 2015, the motion was granted. (ECF No. 99).

On December 18, 2015, Defendant filed a Motion for Summary Judgment with a memorandum in support and attached exhibits. (ECF No. 98). Because Plaintiff was proceeding *pro se*, by Order and <u>Roseboro</u> Notice entered December 21, 2015, Plaintiff was advised of her right to respond to Defendant's dispositive motion. (ECF No. 101). Plaintiff filed a Traverse to Defendant's dispositive motion on January 7, 2016 (ECF No. 102), and on January 11, 2016, a document titled "Factual Presentation." (ECF No. 103). Defendant filed a Reply on January 20, 2016. (ECF No. 104). Mediation was held on January 21, 2016; that same day, Magistrate Judge James Seibert filed a Report of Mediator under seal. (ECF No. 105).

This matter is ripe before the undersigned for review, report and recommendation.

## II.     CONTENTIONS OF THE PARTIES

**A.     The Complaint**

This civil action is the second of three cases Plaintiff has filed in this district regarding the same March 31, 2010, left middle finger injury.[6]

---

[6] <u>See</u> <u>Jacobs v. Wilson</u>, Civil Action No. 5:12cv137 (N.D. W.Va. July 18, 2013) <u>Bivens</u> action dismissed for failure to exhaust, and <u>Jacobs v. Wilson</u>, Civil Action No. 3:13cv89 (N.D. W.Va. July 24, 2014), <u>Bivens</u> action dismissed for failure to state a claim upon which relief can be granted.

Plaintiff has also filed six cases related to a May 2010 stress fracture injury to her right lower leg in this district and in the Northern District of Florida: <u>Jacobs v. Abad</u>, 5:12cv363 (N.D. Fla. Feb. 25, 2014) (<u>Bivens</u> action dismissed for failure to state a claim); <u>Jacobs v. United States</u>, 5:13cv69 (N.D. W.Va. Apr. 14. 2014) (FTCA dismissed for failure to state a claim and warned of three-strike rule), *aff'd.* No. 14-6676 (4th Cir. Sep. 30, 2014); <u>Jacobs v. United States</u>, 5:13cv278 (N.D. Fla.) (FTCA transferred to N.D. W.Va. on Jan. 10, 2014); <u>Jacobs v. Wilson</u>, 1:12cv131 (N.D. W.Va. Dec. 16, 2013) (<u>Bivens</u> action

In the Complaint, Plaintiff alleges that on or about March 31, 2010, she slammed her left middle finger in her cell door at SFF Hazelton, injuring it. Plaintiff alleges that she sustained two lacerations, one on either side of the fingertip, out from the nail (ECF No. 1-2 at 1) and was initially seen by Jamie Hamilton, RN, who referred her to the on-duty medical doctor, Janet Shackelford, M.D. ("Dr. Shackelford"). X-rays were performed, revealing a distal phalangeal fracture. Instead of suturing the lacerations, Dr. Shackelford rinsed them; cleaned the area with Betadine; applied Bacitracin; and wrapped the finger with sterile gauze. Although a splint was not applied that day because none was available, one was ordered for the following day's dressing change. On April 1, 2010, Plaintiff returned to the medical unit where she was seen by Physician's Assistant ("PA") Alicia Wilson ("PA Wilson"). Plaintiff contends that PA Wilson advised her that the skin around the wounds' edges was "dying," thus it was "medically necessary to suture the wound[s] to keep . . . [Plaintiff] from losing her entire fingertip." (ECF No. 1-2 at 2). Using five sutures, "two on one side and three on the other[,]" PA Wilson closed the lacerations. (Id.). Plaintiff alleges that a splint was still not available, so a "hard plastic protective covering" was placed over the finger instead. (Id.). She further alleges that although the sutures were to be removed in seven days, or by April 8, 2010, they were not removed until April 13, 2010,[7] and that by then, the skin had begun to grow around them, requiring forcible removal, causing her further pain and suffering. Id. Three months later, on July 14, 2010, Plaintiff was transferred to FPC Marianna in Marianna, Florida. Id.

---

dismissed for failure to state a claim and for failure to exhaust); and Jacobs v. United States, 5:14cv4 (N.D. W.Va.) (FTCA action transferred from N.D. Fla. to this district on Jan. 10, 2014, and transferred back again on October 16, 2014, docketed as Jacobs v. United States, Civil Action No. 5:14cv269, where it was dismissed as *res judicata* on December 30, 2015) *appeal docketed,* No. 16-10191 (11th Cir. Jan. 19, 2016).

[7] It is apparent from the medical record that Plaintiff did not return to health services until April 13, 2010.

Over nine months after the date of the injury, on January 10, 2011, Plaintiff contends she met with Mid-Level Practitioner ("MLP") Abad at FPC Marianna because she was experiencing finger pain. Abad ordered an X-ray of the finger which revealed a distal tuft fracture with a 2 mm displaced fragment. (ECF Nos. 1-2 at 3). On January 21, 2011,[8] Plaintiff had a follow-up appointment with MLP Abad. She alleges that Abad told her that: she should have been seen by an orthopedic specialist at the time of injury because "[s]urgery was necessary to place the fragments back in place for proper healing;" because the wound was old, FPC Marianna would likely not do anything about it; "the finger would have to be re-broke so that it could be set correctly;" and that Plaintiff should be evaluated by Dr. Toledo. (Id.). Plaintiff saw Dr. Ernesto Toledo ("Toledo") on May 26, 2011, to discuss options for her finger. Plaintiff alleges that Toledo explained that in its current state, the finger would require surgical repair which would cause her more pain than she was currently experiencing, and that she should have seen an orthopedic specialist when the injury first occurred. Id.

As grounds for relief in her Complaint, Plaintiff alleged:

1.  Dr. Shackelford was medically negligent when she failed to prescribe pain medications to effectively control her pain.

2.  Dr. Shackelford's decision not to suture her finger constituted medical negligence and a breach of the prevailing professional standard of care.

3.  Dr. Shackelford and PA Wilson's failure to immobilize her fingertip was medical negligence and a breach of the prevailing professional standard of care.

4.  Dr. Shackelford and PA Wilson's failure to refer her to an orthopedic specialist constitutes medical negligence and a breach of the prevailing professional standard of care.

5.  As a direct and proximate result of the combined negligence of the government, its agents, servants, and employees, she has suffered with an

---

[8] This visit actually took place on January 23, 2011, not on January 21, 2011. See ECF No. 97-1 at 39.

improperly healed finger, displaced bone fragments, limited range of motion, deformity of her finger, and has become, as a direct and proximate result, disfigured. As a result of her injuries, she has suffered pain of mind and body, permanent disability, and disfigurement, and has been damaged in the aggregate sum of at least $2,840,000.00.

6.    As a result of these injuries, she will incur future medical expenses, will lose earnings, will suffer pain of mind and body and will be permanently disabled, disfigured, will a substantial loss of earning capability and will suffer post-traumatic arthritis in her hand, all in the total sum of $2,200,000.00.

Accordingly, Plaintiff requests a total of $5,040,000.00 in damages.

**B.    Defendant's Motion for Summary Judgment (ECF No. 98)**

Defendant asserts that it is entitled to summary judgment and Plaintiff's Complaint should be dismissed because:

1.    Plaintiff has not established that any BOP medical provider breached the standard of care;

2.    The Government's orthopedic expert, James F. Bethea, M.D., found no breach in the standard of care by any of the BOP's medical professionals; and

3.    Plaintiff has failed to establish that any act or omission on the BOP's part proximately caused the alleged remaining damage to her finger.

**C.    Plaintiff's Traverse to Defendant's Motion for Summary Judgment (ECF No. 102)**

Plaintiff reiterates her arguments, disputes certain facts in the record, and attempts to refute Defendant's arguments on the same.

**D.    Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (ECF No. 104)**

Defendant reiterates its position that summary judgment should be granted in its favor, noting that:

1.    Plaintiff's proposed expert medical witness, Cherron Jenkins, D.C., ("Dr. Jenkins"), as a chiropractor, is not qualified to testify regarding the standard of care under the West Virginia Medical Professional Liability Act.

2.      Even if the Court should find that Dr. Jenkins is qualified to testify as an expert witness in this case, Plaintiff still fails to demonstrate that the BOP medical providers breached the standard of care in their treatment of Plaintiff.

## III.      STANDARD OF REVIEW

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that "the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe her pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct Plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## IV.     ANALYSIS

### A.     The Federal Tort Claim Act

The Federal Tort Claims Act ("FTCA") is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States acting within the scope of their employment. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680.

Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place

where the act or omission occurred. 28 U.S.C. §§ 2674 and 1346(b)(1); <u>Cibula v. United States</u>, 551 F.3d 316 (4th Cir. 2009); <u>Medina v. United States</u>, 259 F.23d 220, 223 (4th Cir. 2001). The "acts or omissions" complained of in this case occurred in West Virginia; therefore, West Virginia law applies. In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. <u>Webb v. Brown & Williamson Tobacco Co.</u>, 2 S.E.2d 898, 899 (W.Va. 1939).

**B.    Plaintiff's Medical Records**

Plaintiff's first contact with any BOP health provider the day she injured her finger was with Jamie Hamilton, RN at 12:10 p.m. on March 31, 2010, in Hazelton SFF's Health Services. A visual exam of the wound revealed: "mild bleeding to the tip of the R [sic] middle digit.[9] A laceration is present running under the nail bed [sic][10] and around to the pad of the finger. I/M [inmate] referred to M.D. for evaluation of need for sutures." (ECF No. 100 at 2). Plaintiff was seen by Dr. Shackelford at 12:56 p.m. Dr. Shackelford commented:

> Wound edges fairly well approx[imated][.] as bone broken and risk of infection[,] will not place sutures (foreign body) and will start Bactrim antibiotics prophylactically. Inmate will follow up tomorrow and until wound starts to heal. Warning sx [symptoms] of infection given to inmate to immed[iately] come or have co [correctional officer] call to HS [health services].

<u>Id.</u> at 3.

Dr. Shackelford then elaborated on her findings:

---

[9] It is the left middle finger that was injured, not the right.

[10] It is apparent from the totality of the subsequent medical records, *infra,* that the laceration did not extend underneath the nail.

> Inmate smashed her hand in a door. Cut skin and small amount bleeding very painful. Xray [sic] shows distal phalange fractured. Cut dorsal [top] part of finger to below nail and small lacation [sic] palm surface of distal 1st finger. Cut was clean and min[imal] bleeding. Due to proximity of fractured bone[,] will not place stitch to avoid foreign body and decrease chance of infection. Wound rinsed for 5 minutes[,] cleaned with betadine[,] then bacitracin ointment [applied] and wrapped with sterile guaze [sic] the 4x4s [sic]. No splint avail will obtain for tomorrow's dressing change. Start bactrim DS BID and Motrin. 2008 had tetanus shot.
>
> . . .
>
> Follow up to HS daily for check and dressing change until staff stops visits. Return immed[iately] if fever, increased swelling, bleeding, redness [sic], drainage warmth occurs.

Id. at 4, 5.

Plaintiff was seen again in Health Services approximately 21 hours after her initial injury visit, at 9:33 a.m. on April 1, 2010, by PA Wilson. PA Wilson noted in pertinent part:

> Inmate seen yesterday. She apparently shut her finger in her cell door. Xray [sic] was taken yesterday with a DIP[11] fracture (I think??) [sic].
>
> She returned today for re-evaluation. She had 2 lacerations on either side of left middle finger, out from nail. They did require suturing.
>
> The lacerations were cleaned with povidine first, as the injury occurred yesterday. I then injected 0.2cc %1 Lidocaine into each laceration. I cleaned the wounds again. I then placed 2 interrupted sutures in one laceration and 3 in the other with 6-0 nylon. Her finger was then placed in a protected finger covering and wrapped. She tolerated the procedure well, there were no complications.

Id. at 9. PA Wilson also prescribed Tylenol 300 mg. with Codeine 30 mg. twice daily for three days for pain; the first dose was given in the Clinic at 9:00 am. (Id.).

Plaintiff was seen again on April 5, 2010; at that visit, PA Wilson noted "[f]inger looks great. Healing well. Requesting a few more days pain meds. Dr. Shackelford Ok'd." (ECF No.

---

[11] It is apparent that PA Wilson did not have the X-ray report available to her when she made this note, or she would have realized that Plaintiff did not have a "DIP fracture" (distal interphalangeal joint fracture, i.e. a fracture of the joint between the distal and the medial sections of the finger), but rather, a less complicated tuft fracture.

100 at 11). The indication for the renewed prescription was documented as "Oth[er] superficial injury of lower arm w/o infection." (Id.). Plaintiff received a prescription for three more days of Tylenol with Codeine, at the same dose and schedule previously given. (Id.).

On April 13, 2010, Plaintiff returned to Health Services; she was seen again by PA Wilson, who noted:

> Here today for suture removal. Had sutures placed 4/1 on left middle finger after she slammed finger in a door. She says she is feeling much better. Pain is better. Pain Location: Finger(s)-Left. Pain Scale:[12] 5. Pain Qualities: Aching . . . Skin on finger looks great. No erythema, no discharge. Sutures removed. . . Follow-up at Sick Call as Needed.

(Id. at 12).

The medical records produced in this case and in Case No. 1:12cv131 reveal that Plaintiff was seen by Health Services at USP Hazelton, FPC Marianna, and FCI Tallahassee at least seventeen times for various reasons between June 24, 2010, through May 11, 2012 (ECF No. 100 at 2-44; Case No. 1:12cv131, ECF No. 32-3 at 58-66). In a Health Intake Assessment performed on July 6, 2010, incident to Plaintiff's transfer to FPC Marianna, when asked if she currently suffered from "any painful condition?" Plaintiff responded "Yes. Head [also] pain in teeth or mouth." (ECF No. 100 at 14). She did not report any left finger pain, and where the form provided space for an inmate to "describe any other medical . . . condition you have" she left the area blank. (Id.).

Plaintiff was also seen on July 27, 2010, in Health Services at FPC Marianna by MLP Abad for a complete physical exam. At that time, she reported that her only current painful

---

[12] Medical providers commonly assess patients' pain using a visual analogue scale ("VAS") from one to ten, which measures pain from "no pain" (zero) to the worst pain imaginable (ten). A complaint of pain at a level of "2" would be equivalent to "hurts just a little bit." See Faces Pain Scale, *available at* https://www.ttuhsc.edu/provost/clinic/forms/ACForm3.02.A.pdf

conditions were "right lower leg injury in 05-2010 doing aerobic exercises[.] Left lower leg hematoma n [sic] 07-26-2010 whlie [sic] pulling the garbage, the garbage container hit left lower leg." (Id. at 17). The examiner noted that Plaintiff had no deformities of her extremities and no visible problem with her fingernails on extremity exam. (Id. at 25). Nonetheless, Plaintiff was advised to follow up at sick call and at Chronic Care as needed. (Id. at 29).

Plaintiff made no more mention of a problem with her left middle finger until December 2010, when she filed a request with the BOP for an informal resolution ("BP-8") related to her finger injury, claiming "I severely cut and broke the tip of my middle L finger at Hazelton FCI in W. Virginia" and requested "reconstructive and rehabilitative treatment and services." (See Case No. 3:13cv89, ECF No. 18-1 at 4). In a December 13, 2010, response, her counselor advised "[o]ld injury to finger - Medical provider has ordered xray [sic] to ensure proper healing." (See Case No. 3:13cv89, ECF No. 18-1 at 4).

Thereafter, Plaintiff was seen by MLP Abad at a January 10, 2011, Health Services visit at FPC Marianna. The record indicates she presented for several complaints, one of which was pain in the finger. On a "Wrist/Hand/Fingers" exam, she was found to have full range of motion; normal active range of motion; normal passive range of motion; neurovascular supply to the area was intact; there was no joint deformity; malalignment; swelling; bruising; redness; or tenderness. (ECF No. 100 at 32). An X-ray performed three days later on January 13, 2011, revealed her old distal tuft fracture with a 2 mm displaced fragment. (Id. at 38). Because she was already taking Indomethacin for a right lower leg injury, no further medication was ordered.

On January 23, 2011, Plaintiff had a follow up encounter for her left middle finger with MLP Abad, performed at Health Services. She complained of aching type pain, a level "2" on a scale of 10 and reported that moving the finger exacerbated the pain and rest relieved it. (Id. at

39). Her Wrist/Hand/Fingers exam indicated "normal passive range of motion, neurovascular intact, joint deformity [sic], and tenderness, but no full range of motion [sic], normal active range of motion [sic], and there was no swelling, bruising or redness."[13] (Id. at 40).

The record of a May 26, 2011, exam by Dr. Toledo at FPC Marianna to evaluate "an old injury" indicates that Plaintiff's left middle finger had an old healed scar with numbness at the distal medial side, and she had no pain from the distal tip of the finger, but "some pain when pressing the fingertip." (ECF No. 100 at 42). Dr. Toledo noted that he advised Plaintiff that there was nothing to be done for the fractured distal tuft; she was advised to "continue exercising the motion of the fingertip;" and that Plaintiff "expressed understanding everything explained."[14] Id.

---

[13] The January 10, 2011, Clinical Encounter was consistent with the July 27, 2010, H&P, indicating that Plaintiff's Wrist/Hand/Fingers exam revealed full range of motion and normal active and passive range of motion. Given the normal findings only thirteen days earlier, inconsistencies in the January 23, 2011, Wrist/Hand/Fingers exam, noting that Plaintiff had normal passive range of motion but lacked full range of motion and normal active range of motion seem to indicate that this was either transcription or typographical error, especially since later examiners found no such thing.

[14] On May 16, 2011, Plaintiff filed a BP-9, requesting to talk to an orthopedic specialist to evaluate her damaged left middle finger. (Case No. 3:13cv89, ECF No. 18-1 at 5). On June 3, 2011, the Warden denied Plaintiff's BP-9 remedy request regarding her finger, stating in pertinent part, that:

> You were evaluated on May 26, 2011, by the Clinical Director here at FCI Marianna, due to your continued concerns regarding your finger. The Doctor reviewed your medical record regarding this injury and evaluated the current status of your finger. He advised there is no other treatment recommended for your finger. He counseled you on exercising your fingertip to help increase motion and flexibility.

(Case No. 3:13cv89, ECF No. 18-1 at 5).

Although Plaintiff was seen four more times thereafter in Health Services for various complaints through September 22, 2011, there was never any further mention of finger pain, her finger injury, or any request for additional treatment for it. (See Case No. 1:12cv131, ECF No. 32-3 at 58-67).

On October 6, 2011, Plaintiff filed a Regional Administrative Remedy Appeal (BP-10), again requesting to see and talk to an orthopedic specialist about her finger. She received a denial of that remedy on December 27, 2011, which noted that:

> Your sutures were removed on April 13, 2010, and you indicated you were feeling much better. You did not voice any further complaints of pain in your injured finger until your Hypertension Chronic Care Clinic encounter on January 10, 2011, at which time your

Plaintiff was apparently transferred from FCI Tallahassee, in Tallahassee, Florida on April 24, 2012. Incident to that transfer, Plaintiff had a BOP health services examination on April 23, 2012. She made no report of pain in her finger and there were no longer any pain medications among her current medication list, except for an ergotamine/caffeine preparation to be taken on an "as needed" basis for migraines. She was cleared for "all sports" and for food service. (ECF No. 100 at 43-44).

Nonetheless, on June 13, 2012, while at Waseca FCI, Plaintiff requested and was referred for a Physical Therapy Consult by one S. Taylor, PA-C to evaluate her complaints of pain in her right lower leg and her left middle finger, who noted in pertinent part:

Reason for Request:

IN HOUSE: Patient . . . #2 C/O [complains of] ***"When I was at Hazelton I almost cut my finger off in the door and never have [sic] a splint for it or follow up and now it bothers me."*** (left long finger) (fingertip area) . . . Left long finger DIP area of finger with old well healed scarring noted, + tender with ROM [range of motion] and with palpation, no redness and no drainage, no open wound noted. Please evaluate and advise treatment plan . . .

Medications (As of 6/21/2012) Acetaminophen [Tylenol] 500 MG Tab Exp [prescription expires] 7/13/2012 . . . one tablet by mouth twice daily as needed for pain for 30 days. Divalproex ER [Depakote ER][15] . . . one tablet by mouth at bedtime . . . Flunisolide Nasal (Nasalide)[16] . . . two puffs in each nostril twice

---

pain medication was renewed[14] . . . **On May 26, 2011, the Clinical Director reviewed the results of an X-ray of your left third finger conducted on January 12, 2011 [sic]. The X-ray showed a 2 mm fragment from fracture of the distal tufts. The Clinical Director examined your finger and subsequently explained that your condition does not require any further treatment** . . . you received appropriate treatment in accordance with your clinical presentation. Your condition does not warrant an orthopedic consultation.

Case No. 3:13cv89, ECF No. 18-1 at 8 (emphasis added).

[15] Depakote ER is an anti-seizure medication. See Depakote ER, *available at* http://www.rxlist.com/depakote-er-drug/patient-images-side-effects.htm.

[16] Nasalide is indicated for the management of the nasal symptoms of seasonal or perennial rhinitis (hay fever). See Nasalide, *available at* http://www.rxlist.com/nasalide-drug/indications-dosage.htm.

daily . . . Hydrochlorothiazide 25 MG . . . one tablet by mouth each morning . . . Lisinopril 10 MG Tab[17] . . . one tablet by mouth each morning[.] Potassium Chloride 10 mEq ER Tab . . . one tablet by mouth each day . . .

Id. at 45 (emphasis added). The consult request was approved on June 20, 2012. (Id. at 46).

On July 7, 2015, Plaintiff's chiropractic expert Dr. Jenkins examined her and noted that Plaintiff was "unable to make a fist with left hand" and that her "grip strength was decreased upon evaluation." (ECF No. 98-4 at 21). However, on July 20, 2012, the Physical Therapy consultation for her left middle finger and her right lower leg took place. The therapist's report indicated, in pertinent part:

Reason for visit. Patient is FCI inmate who is complaint [sic] of . . . a crush type injury to her left 3rd finger DIP area [sic]. States that the pain is somewhat variable and activity dependent.

Objective. Examination reveals . . . ***The patient is able to make a full fist with her left hand and all digits and grip strength is 3/5 again with poor and inconsistent effort.***

Impression. Negative for special tests . . . Patient is complaining of . . . left hand third digit finger discomfort continuing to complain of pain. She has full range of motion of her left hand. ***This therapist is unsure of the source of her pain.***

Plan . . . Explained to her that there has been a significant amount of time that has passed that these fractures should have been well healed. We are unsure if she did have a recent X-ray but given objective findings did not feel that this would be particularly beneficial. Simply can continue to encourage her being active and exercising. ***No follow up necessary.***

Goals: Patient will be evaluated for . . . hand pain. ***Patient dismissed.***

ECF No. 100 at 47 (emphasis added).

S [subjective]: c/o [complains of] . . . L 3rd digit distal phalanx fx . . . same year [2010].

---

[17] Hydrochlorothiazide and Lisinopril are blood pressure medications. See Hydrochlorothiazide, a*vailable at* http://www.drugs.com/hydrochlorothiazide.html; see also Lisinopril, *available at* http://www.drugs.com/lisinopril.html.

O [objective]: . . . ***L hand can make full fist and finger flexion strength 3/5 with poor effort.***

A [assessment]: . . . L 3rd finger fx and con't [continue] fair complaint.

P [plan]: . . . ***No concerns just encouraged to con't w/ ex's*** [exercises].

Id. at 48 (emphasis added).

On September 15, 2015, however, Plaintiff was seen on referral from Dr. Jenkins to an orthopedist, David Koon, M.D., ("Dr. Koon") who noted that Plaintiff's left middle finger "demonstrates active flexion of the PIP, and DIP . . . She has full range of motion of the DIP, PIP, MCP. There is [sic] no angular or rotational deformities." (ECF No. 98-7 at 2). Dr. Koon's report does not indicate whether he reviewed Plaintiff's old medical records and in fact indicates that Plaintiff advised him that she had suffered a "fracture of the distal phalanx *which was not really treated. He [sic] denies being splinted or casted at that time*." (ECF No. 98-7 at 2) (emphasis added). This report directly contradicts the report of Dr. Jenkin's, Plaintiff's expert, who noted that Plaintiff "stated she received care initially for the injury while incarcerated." (ECF No. 98-4 at 21).

C.      **The Medical Literature**

As an initial matter, the undersigned must digress from the analysis of Plaintiff's claims to provide a clearer understanding of the anatomy of the fingers and the nature of the injury at issue here.

In each finger,[18] there are three bones or phalanges, the proximal, middle, and distal.[19]



The "distal phalanx" is the fingertip. It is itself divided into three anatomical zones: the epiphysis, most proximally (closest to the hand), followed by the diaphysis (the "waist," in the middle), and finally the "ungual tuberosity" (commonly referred to as the "tuft") or tip.[20] The joints between the phalanges are referred to as the DIP (distal interphangeal joint, or the joint between the distal (tip or tuft) and the diaphysis (the middle) bones; the PIP (the proximal interphalangeal joint, between the medial and proximal phalange); and the MCP (metacarpal-phalangeal joint, between the proximal phalange and the metacarpal bone).

---

[18] The thumb, however, only has two phalanges.

[19] <u>See</u> Anatomy of the Hand, *available at* http://healthcare.utah.edu/orthopaedics/healthlibrary/doc.php?type=85&id=P01098.

[20] <u>See</u> K-Wire Fixation, *available at* https://www2.aofoundation.org/wps/portal/surgery?showPage=redfix&bone=Hand&segment=Thumb&classification=76-Distal%20phalanx:%20Distal%20and%20Shaft,%20Transverse&treatment=&method=Transverse%20distal%20and%20shaft%20fracture&implantstype=K-wire%20fixation&approach=&redfix_url=1285238721570&Language=en.

Plaintiff herein sustained a "tuft" fracture of the ungula tuberosity, meaning that a small fragment of bone chipped off the edge of the distal phalanx, the very tip of the bone of her left middle fingertip. Tuft fractures are commonly associated with lacerations, crush forces, and/or subungual hematomas (collections of blood under the nail) a sign of injury to the nailbed.[21] They are the most common distal phalanx injury.[22] By definition, a tuft fracture is a comminuted fracture of the head and tuberosity of the distal phalanx, usually without any displacement or angulation.[23] A "comminuted fracture" is one in which a bone is broken, splintered, or crushed into a number of pieces.[24] Due to the proximity and support of the fingernail on the top or dorsal side of the finger, and the fibrous septa[25] inside the pulp, (the fatty pad inside the palm side of the fingertip), tuft fractures are generally considered stable.[26] Because the distal phalanx is well supported by the relatively stiff fibrous septa beneath and the overlying nail matrix above, and does not have any tendons spanning the bone as deforming forces, these fractures generally heal without undue complications.[27]

---

[21] See Five Key Injuries of the Wrist and Hand, *available at* http://www.ahcmedia.com/articles/64730-five-key-injuries-of-the-wrist-and-hand; see also Distal Phalangeal Fractures, *available at* http://www.melbournehandsurgery.com/fractures/36-hands/fractures/191-distal-phalangeal-fractures.

[22] See American Family Physician, Common Finger Fractures and Dislocations, *available at* http://www.aafp.org/afp/2012/0415/p805.html.

[23] See Five Key Injuries of the Wrist and Hand, *available at* http://www.ahcmedia.com/articles/64730-five-key-injuries-of-the-wrist-and-hand.

[24] See Definition of Comminuted Fracture, *available at* http://www.medicinenet.com/script/main/art.asp?articlekey=8079.

[25] Septa is plural for septum, a dividing wall, membrane, or the like, in a plant or animal structure. See Septa, *available at* http://dictionary.reference.com/browse/septa.

[26] See Five Key Injuries of the Wrist and Hand, *available at* http://www.ahcmedia.com/articles/64730-five-key-injuries-of-the-wrist-and-hand.

[27] See Fractures and Dislocations of the Hand. Skeletal Trauma, *available at* http://z0mbie.host.sk/Fractures-and-Dislocations-of-the-Hand.html.



See Palmar Spaces, *available at* http://www.slideshare.net/UthamalingamMurali/palmar-spaces-types-contents.

The medical literature also reveals that:

[L]ittle has been written about . . . [tuft] fractures, **probably because the treatment of most tuft fractures is simple, requiring only protective splinting for pain relief for 2-3 weeks** . . . most publications concentrate on the soft-tissue component of this injury. [If sustained] [s]ubungual [beneath the nail] hematomas are drained, nail matrix and pulp lacerations are sutured, and the nail plate is usually replaced under the nail fold. **The tuft fracture itself is almost always treated either with "skillful neglect" or with a simple splint for 2-3 weeks. A rare indication for longitudinal Kirschner wire fixation would be the absence of the nail plate in a severely crushed fingertip. In these cases, sutures hold poorly because of the crushed tissues and the Kirschner wire provides stability for the nail bed repair . . . It is well recognized that tuft fractures often do not show signs of union on X-ray for several months . . . but it is thought that these fractures are stabilized by fibrous union. In this distal part of the distal phalanx, this form of union is usually quite stable and asymptomatic.**

See Al Qattan MM, Hashem F, Helmi A. Irreducible Tuft Fractures of the Distal Phalanx.

J. Hand Surg. [Br.] 2003; 28: 18-20 (emphasis added).

Further, a prospective study of 110 patients with fractures of the distal phalanx revealed

that:

> [L]ess than one in three patients . . . will have recovered after six months. Less than one half of distal phalangeal fractures will have united by then. . . . Open injuries were . . . sutured. None of the fractures were internally fixed and no procedures aimed at obtaining primary skin cover were adopted in view of the satisfactory results achieved without them[.]

See D.J. DaCruz; R.J. Slade, W. Malone. Fractures of the Distal Phalanges. J. Hand Surg. Br.

1988; 13(3): 350-52.

Tuft fractures:

> [D]o not require wiring or pinning, as they will heal by themselves. The significance of the injury is predominantly that . . . [the] fingertip will be sore for longer. If . . . [a patient] hit[s] . . . [his or her] thumb with a hammer . . . [he or she] might expect it to be sore for a couple of weeks. If . . . [a patient] hit[s] . . . [his or her] thumb with a hammer and . . . break[s] the bone . . . . [it's] likely . . . [to be] sore to pressure for 6 weeks or more. In this situation, wearing a bulky bandage or a "thimble" type plastic splint can be helpful in preventing …[the patient] from knocking . . . [his/her] distal phalanx while it heals. Tuft fractures don't need to be put in a cast.[28]

Nonetheless, potential complications of a tuft fracture include pain, cold weather

intolerance, altered sensibility, nail bed and nail deformity (where an injury to the same was

sustained), malunion, and even (as is the case here) nonunion.[29]

---

[28] See Distal Phalangeal Fractures, *available at* http://www.melbournehandsurgery.com/fractures/36-hands/fractures/191-distal-phalangeal-fractures.

[29] See Fractures and Dislocations of the Hand, Skeletal Trauma, *available at* http://z0mbie.host.sk/Fractures-and-Dislocations-of-the-Hand.html.

However, "nonunion of a tuft fracture is rare . . . Nonetheless, should a nonunion occur, [i]f the patient is asymptomatic and uses the hand without any difficulties, radiographic nonunion should be ignored."[30]

Here, while it certainly had the potential to be much more severe, Plaintiff's tuft fracture damage was relatively limited. She sustained two lacerations, one on each side of the fingernail, that were closed with two and three stitches, respectively, and she has a 2 mm bone fragment nonunion. Two millimeters is equal to 0.0787402 inches.[31] Nothing in the medical records reflects that she damaged her fingernail or the nailbed beneath it. Further, nothing in the record suggests there was a need for her fingernail to be removed to drain a "subungual" (beneath the nail) hematoma and nothing reflects that the "pulp" or fleshy part of the palm-side of her fingertip was crushed. Because the fingernail and the stiff septa in the pulp of her fingertip remained intact, no physician who examined Plaintiff has opined that surgical fixation of the fracture fragment was necessary to stabilize the fracture.

**D.      Medical Negligence**

In addition to determining whether Defendant's medical providers breached the applicable standard of care, a key issue presented here is whether Plaintiff's expert, Dr. Jenkins, a chiropractor, is qualified to opine as to whether Dr. Shackelford, a medical doctor, and PA Wilson, a physician's assistant, breached the applicable standard of care in the treatment they provided Plaintiff.

To establish a medical negligence claim in West Virginia, Plaintiff must prove:

---

[30] Fractures and Dislocations of the Hand, Skeletal Trauma, *available at* http://z0mbie.host.sk/Fractures-and-Dislocations-of-the-Hand.html.

[31] See Millimeters to Inches Conversion, *available at* http://www.rapidtables.com/convert/length/mm-to-inch.htm.

(a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3. When a medical negligence claim involves an assessment of whether or not a plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

In Mayhorn v. Logan Medical Foundation, 193 W.Va. 42, 454 S.E.2d 87 (1994), the West Virginia Supreme Court of Appeals ("WVSCA") held that Rule 702 of the West Virginia Rules of Evidence ("Rule 702") is "the paramount authority for determining whether or not an expert is qualified to give an opinion." Mayhorn, 193 W.Va. 42 at 49.

Rule 702 states: "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The essence of Rule 702 is that of assisting the fact finder's comprehension through expert testimony. Sheely v. Pinion, 200 W.Va. 472, 478, 490 S.E.2d 291, 297 (1997).

In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a . . . court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify. Syl. Pt. 5, Gentry v. Magnum, 195 W.Va. 512, 466 S.E.2d 171 (1995).

West Virginia Code § 55-7B-7 addresses the competency of witnesses in medical malpractice cases. In its previous iteration, W.Va. Code § 55-7B-7 provided:

> The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that: (a) the opinion is actually held by the expert witness (b) the opinion can be testified to with reasonable medical probability; (c) such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (3) such expert maintains a current license to practice medicine in one of the states of the United States; and (e) **such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider**.

W.Va. Code § 55-7B-7 (1986) (emphasis added).

In 2003, W.Va. Code § 55-7B-7 was amended to read in pertinent part:

> (a) The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) **the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed**; (4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available; (5) **the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States**: Provided, That the expert witness's license has not been revoked or suspended in the past year in any state; and (6) **the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient**. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert. Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends

in active practice or teaching in his or her medical field unless good cause can be shown to the court.

W.Va. Code § 55-7B-7(a) (emphasis added).

Accordingly, it is apparent that it is no longer a requirement that a proffered expert witness in a medical malpractice action be engaged or qualified in the same or substantially similar medical field as the defendant health care provider. It is only required that the proposed witness be familiar with the standard of care alleged to have been breached. Fitzgerald v. Manning, 679 F.2d 341 (4th Cir. 1982). However, although a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not engaged in practice as a specialist in the field about which his or her testimony is offered . . . it is clear that a medical expert may not testify about any medical subject without limitation. Gilman v. Choi, 185 W.Va. 177, 181, 406 S.E.2d 200, 204 (1990) (*overruled on other grounds as stated in* Mayhorn v. Logan Medical Foundation, 193 W.Va. 42, 49, 454 S.E.2d 87 (1994)). "The salient inquiry is to what extent the physician witness is qualified to testify as an expert on the issue of a medical malpractice defendant's standard of care in treating a patient suffering a condition equivalent to the plaintiff's." Fortney v. Al-Hajj, 188 W.Va. 588, 425 S.E.2d 264 (W.Va. 1992). Further, a medical malpractice plaintiff must prove that the defendant specialist failed to meet the standard of care required of physicians in the same specialty practiced by the defendant; and to qualify a witness as an expert on that standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty. Gilman v. Choi, 185 W.Va. at 181.

It is well established that the training and specialization of a physician expert witness in a medical malpractice case goes to the weight rather than to the admissibility of the testimony. Frost v. Mayo Clinic, 304 F. Supp. 285 (D. Minn. 1969); see also Gentry v. Mangum, 195 W.V.

512, 527, 466 S.E.2d 171, 186 (1995). While there is no dearth of case law to show that under certain circumstances, a physician from one specialty is permitted to opine as to the breach of the standard of care of a physician from another specialty,[32] where a physician from one specialty cannot demonstrate the requisite training, experience, or familiarity with the standard of care applicable to that of the defendant physician, such testimony is barred.[33]

---

[32] <u>Dolen v. St. Mary's Hosp., Inc.</u>, 203 W. Va. 181, 506 S.E.2d 624 (1998) (*per curiam*) (plaintiff's oral surgeon expert qualified under Rule 702 to render expert testimony regarding the negligence of the defendant emergency room ("E.R.") doctor's and radiologist's negligence in their treatment of plaintiff's broken jaw, because the oral surgeon (a) had substantial educational and experiential qualifications relating to jaw fractures; (b) his field of expertise was relevant to the diagnosis by panorex X-ray films of patient's jaw and the treatment of jaw fractures; and (c) this expertise would assist the trier of fact); <u>Gilman v. Choi</u>, 185 W. Va. 177, 406 S.E.2d 200 (W. Va. 1990) (testimony of plaintiff's proffered expert, a board certified orthopedic surgeon, not barred merely because he was not certified in the same specialty as defendant physicians, an internist and an E.R. physician, where plaintiff's orthopedic surgeon expert testified as to standard of care for an internist or E.R. doctor regarding whether their allegedly negligent treatment necessitated plaintiff's total hip replacement); <u>Mayhorn v. Logan Medical Found.</u>, 193 W. Va. 42, 454 S.E.2d 87 (1994) (testimony of plaintiff's expert, a board certified internist and professor of cardiology with specific knowledge about the preventable arrhythmia caused by the acute myocardial ischemic condition at issue; history of eight years' full-time employment in an E.R. and continued E.R. work on an as-needed basis when he was called in to see patients in the E.R. for cardiology problems, should have qualified, even though it conflicted with opinion as to cause of death offered by defendant hospital's pathologist); <u>Fortney v. Al-Hajj</u>, 188 W. Va. 588, 188 W. Va. 588, 425 S.E.2d 264 (W. Va. 1992) (general surgeon allowed to testify as plaintiff's expert against an E.R. physician because the surgeon had vast experience in handling cases of food impacted in patients' throats, the issue at hand).

[33] <u>See</u>, e.g., In <u>Kiser v. Caudill</u>, 210 W.Va. 191, 557 S.E.2d 245 (2001) (*per curiam)* ("Kiser 1"), a medical malpractice case with an even longer and more tortured history than the instant one, plaintiff's expert neurologist was not qualified to render an opinion as to the applicable standard of care required of the defendant neurosurgeon); on appeal for the second time in <u>Kiser v. Caudill</u>, 215 W.Va. 403, 599 S.E.2d 826 (2004) ("Kiser 2"), the WVSCA held that despite the fact that Kiser's remaining expert, a board-certified neurosurgeon who had devoted the first fifteen years of his clinical practice to pediatric neurosurgery and had personally performed two to five neurosurgical procedures to untether spinal cords, including cords fixed to a lipoma, like plaintiff's, was not qualified to testify because he had no more than a casual familiarity with the applicable standard of care; was not an expert on tethered spinal cords; had never written on the subject nor performed any scientific studies on the same; and could not cite to any medical textbooks or literature to support his opinions regarding tethered spinal cord diagnosis and treatment in 1973); <u>Connelly v. Kortz</u>, 689 P.2d 728, 729-30 (Col. Ct. App. 1984) (internal medicine specialist with only casual familiarity with standards of care for general surgeons was not qualified to testify against general surgeon as to proper indications for surgery); <u>Greene v. Thomas</u>, 662 P.2d 491, 493-94 (Col. Ct. App. 1982) (plaintiff's dermatologist was not qualified to testify as to standard of care for plastic surgeons, where dermatologist had only casual familiarity with plastic surgery procedure at issue, <u>cert. denied</u> (Colo. May 2, 1983); <u>Wielgus v. Lopez</u>, 525 N.E.2d 1272, 1274 (Ind. Ct. App. 19883) (testimony of plaintiff's expert anesthesiologist was excluded because he was not familiar with surgical

Further, "cross-discipline" testimony, where an expert medical provider from one discipline is permitted to opine as to the standard of care of a medical provider from an entirely different discipline, is necessarily even more strictly limited. Only in those cases in which the proffered expert is able to demonstrate the knowledge and experience necessary to render an expert opinion and does not exceed the scope of his or her expertise by addressing the issues of causation is such testimony permitted. The exception to this general rule arises whenever the methods of treating a particular ailment are generally the same in either school. See Creasey v. Hogan, 48 Ore. App. 683, 690, 617 P.2d 1377, 1380 (1980) (plaintiff's orthopedic surgeon expert permitted to offer opinion against defendant podiatrist, because both performed bunionectomies, the surgery at issue). See also Creekmore v. Maryview Hosp., 662 F.3d 686 (4th Cir. 2011) (OB-GYN doctor permitted to testify as an expert regarding the standard of care for a nurse's postpartum monitoring of a high-risk pre-eclamptic patient, because the OB-GYN was qualified to testify as an expert in the standard of care under Virginia law, and the OB-GYN performed the same postpartum monitoring of high-risk pre-eclamptic patients in the same context in which it was alleged that the hospital and its nurses deviated from the standard of care).

The Fourth Circuit Court of Appeals has held that

The knowledge requirement does not demand an identical level of education or degree of specialization; rather, it can be shown by evidence that the standard of

---

standard of care for defendant surgeon); Syl. pt. 2, Swanson v. Chatterton, 281 Minn. 129, 160 N.W.2d 662 (1968) (testimony of plaintiff's medical expert against defendant orthopedic surgeon was excluded, even though he was chief of medical staff at a large hospital and a specialist in internal medicine, because he had little or no experience with the orthopedic surgery at issue and no familiarity with same, except for general learning in medical school fifteen years earlier).

care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant doctor's specialty. Thus, the inquiry focuses on the expert's knowledge of, and experience with, the specific procedure at issue, not on the expert's professional qualifications relative to those of the defendant practitioner.

Creekmore v. Maryview Hosp., 662 F.3d 686, 691 (4th Cir. 2011). However, where proffered experts from one specialty are *not* found to demonstrate the requisite knowledge, training, experience and familiarity with the applicable standard of care necessary to testify as experts against a defendant from another specialty, such testimony is barred.[34]

---

[34] See Short v. Appalachian OH-9, Inc., 203 W. Va. 246, 507 S.E.2d 124 (1998) (plaintiff's experts, a neonatal intensive care nurse and two witnesses knowledgeable and experienced in emergency medical services not qualified to testify that infant's death was proximately caused by any actions of the ambulance personnel, because the expertise of a physician was needed); Estate of Hezekiah Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844 (W.D. Va. 2008) (plaintiff's expert, a licensed clinical psychologist who practiced exclusively in the state of Oregon, not qualified to testify regarding the applicable standard of care for defendant physicians because he was not a medical doctor or a nurse; was not licensed to practice psychology or any medical specialty in Virginia; had received no formal training in Virginia or any training regarding the provision of medical or mental health services in a correctional setting; and because he was not a medical doctor, he was not qualified to render an expert opinion on the issue of proximate cause of death of agitated psychotic pretrial detainee while in custody); Taplin v. Lupin, 700 So. 2d 1160; 1997 La. App. LEXIS 2400; 97-1058 (La. App 4 Cir. 10/01/97) (Registered nurse was not an expert when it came to the standard of care a doctor owed a patient and was not competent to opine as to whether the standard was breached or whether the breach caused the patient's injuries); Peck v. Tegtmeyer, 834 F.Supp. 903 (W.D. Va. Oct. 7, 1992) (radiation physicist not qualified to testify as to the standard of care for a radiologist, because he never had a radiological clinical practice; admitted that he did not "get involved with the patient;" radiation physics is not a field of medicine at all, let alone a "related field of medicine" to radiology, because a career in radiation physics, like the expert's, required no medical training. Even if radiation physics could be considered a "related field of medicine," the expert had never had what could be called a "clinical practice" in radiation physics). Likewise, in Taormina v. Goodman, 63 A.D.2d 1018, 406 N.Y.S.2d 350 (1978), the testimony of a medical doctor was offered as an expert against a defendant chiropractor. The New York court held that because a medical doctor was not a member of the chiropractic discipline, the doctor was not competent to testify to the alleged malpractice of a chiropractor. Taormina, 406 NY.S.2d at 351-52. The Taormina court's rationale is significant:

> To recover damages predicated upon the malpractice of a chiropractor, plaintiffs' proof at the trial did not include the testimony of any chiropractic experts, but rather medical doctors, whose knowledge of chiropractics was admittedly quite limited. The testimony of these doctors only served to establish defendant's deviation from a medical standard of care in his treatment of the plaintiff. Accordingly, there was no competent trial evidence upon which the jury could have predicated its finding . . . that defendant had failed to exercise 'that degree of care that a reasonably prudent chiropractor would exercise under the circumstances.' "Under present New York law, the practice of chiropractic is separate

While chiropractors can be expert witnesses, their testimony is necessarily limited to matters on which they are qualified.[35] Chiropractors have been permitted to testify in medical malpractice actions against physicians, but only regarding matters within the area of the chiropractors' expertise; they are permitted to give expert opinions, to a reasonable degree of medical certainty as to the permanency of injuries in the areas of the body they are authorized to treat. See Klein v. Harper, 186 N.W.2d 426, 429-31 (N.D. 1971) (medical opinion regarding permanency of spinal injury); Ness v. Yeomans, 60 N.D. 368, 234 N.W. 75, 76-77 (N.D. 1931) (interpretation of X-rays in a medical malpractice action).

Nonetheless, a chiropractor's training, skill, and experience is well recognized to be less than that of a physician's. See Scales v. Swill, 715 So.2d 1059, 1060, 1998 Fla. App. LEXIS

and distinct from the practice of medicine . . . so that a physician's standard of care can no longer be considered controlling upon a chiropractor in the practice of his profession.

Id. at 352. See also Morgan v. Hill, 663 S.W.2d 232, 234 (Ky. Ct. App. 1984) (physician was ruled incompetent to testify as to the standard of care of chiropractor); Johnson v. Lawrence, 720 S.W.2d 50, 54-55 (Tenn. Ct. App. 1986) (testimony of medical doctors not competent to prove the standard of care required of chiropractors); Maxwell v. McCaffrey, 219 Va. 909, 913, 252 S.E.2d 342, 345 (1979) (orthopedic surgeon not permitted to testify regarding standard of care required of a chiropractor); Broderson v. Sioux Valley Memorial Hosp., 902 F. Supp. 931, (N.D. Iowa 1995) (three medical doctors not qualified to testify as to the standard of care required of a chiropractor).

[35] See Vitale v. Tisch, 662 F.Supp. 975, 975 (S.D.N.Y. 1987) (FTCA personal injury suit accepting chiropractor's opinion regarding the permanence of injuries to plaintiff's cervical spine, ligaments, and nerves; pain, suffering and need for continued physical therapy, traction, neurological and orthopedic evaluations and intensive chiropractic treatment for life); McKissick v. Frye, 255 Kan. 566, 876 P.2d 1371, 1389-90 (Kan. 1994) (chiropractor's testimony sufficient to establish with reasonable certainty the need for plaintiff to receive future chiropractic care); Iorio v. Grossie, 663 So.2d 366, 371 (La. Ct. App. 1995); O'Dell v. Barrett, 163 Md. 342, 163 A. 191, 192 (Md. 1932) (chiropractor permitted to provide expert testimony on probable effect on the spinal column of a disarrangement of the pelvis, especially when testifying regarding to conditions he had personally examined); Vallejos v. KNC, Inc., 105 N.M. 613, 735 P.2d 530, 532 (N.M. 1987) (chiropractor's testimony admissible as expert medical testimony required in contested cases under N.M. Stat. Ann. §52-1-28(B) to establish the causal connection between the work-related injury and disability); Elliott v. Patterson, 12 Md. App. 341, 278 A.2d 431, 433 (Md. Ct. Spec. App. 1971) (chiropractor, plaintiff auto accident victim's only medical witness at trial, permitted to testify as to: his examination/findings that plaintiff had musculo-ligamentous strain of the spine and chest contusions; his treatment thereof; and his opinion, based upon reasonable medical certainty, that plaintiff's injuries proximately caused his condition, which resulted in a permanent partial disability of the lower back and mild residual disability of the neck).

9710 (1998) (personal injury plaintiff challenged the trial court's ruling requiring him to undergo an independent medical exam ("IME") by an orthopedic surgeon, given that he had already had an exam by his own chiropractor; held: the trial court was within its discretion to decide the issue, "given that orthopedic doctors and chiropractors are not synonymous in training or expertise."); Sebroski v. United States, 111 F. Supp. 2d 681; 1999 U.S. Dist. LEXIS 22131 (D. Md. Nov. 5, 1999) (FTCA suit, alleging that federal employee negligently caused auto accident resulting in plaintiff's injuries; held: properly qualified chiropractor was competent to testify as an expert witness as to the necessity and reasonableness for past and future palliative chiropractic therapy for plaintiff's whiplash injury, but in Maryland, a chiropractor is not a physician, and a chiropractor was not qualified to testify as to the necessity of an MRI and the reasonableness of the charges, as the necessity of such a test lay beyond his area of training and expertise. Further, the orthopedist's testimony as to plaintiff's need for and frequency of future chiropractic treatment was found more credible than chiropractor's in limiting allowable damages for and frequency of future chiropractic treatment); Ford v. Peters, 2005 U.S. Dist. LEXIS 9262; 2005 WL 1105061 (D.N.D. May 5, 2005) (Based on the professional status accorded chiropractors under North Dakota law and the breadth of their training, the North Dakota Supreme Court has concluded that "the practice of chiropractic is the practice of medicine, although in restricted form . . . .").[36]

---

[36] In West Virginia, a chiropractor is not a physician. Under W.Va. Code § 30-16-3, "chiropractic" is defined as the science and art which utilizes the inherent recuperative powers of the body and the relationship between the neuromusculoskeletal structures and functions of the body, particularly of the spinal column and the nervous system, in the restoration and maintenance of health. *But cf.* W.Va. Code § 30-3-4(3), which defines "practice of medicine and surgery" as the diagnosis or treatment of, or operation or prescription for, any human disease, pain, injury, deformity or other physical or mental condition. "Surgery" includes the use on humans of lasers, ionizing radiation, pulsed light and radiofrequency devices.

Finally, "[w]hether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Syl. Pt. 5, Overton v. Fields, 145 W.Va. 797, 117 S.E.2d 598 (1960); Syl. Pt. 4, Hall v. Nello Teer Co., 157 W.Va. 582, 203 S.E.2d 145 (1974); Syl. Pt. 12, Board of Education v. Zando, Martin & Milstead, 182 W.Va. 597, 390 S.E.2d 796 (1990); Syl. Pt. 3, Wilt v. Buracker, 191 W.Va. 39, 443 S.E.2d 196 (1993); Syl. Pt. 5, Mayhorn v. Logan Medical Foundation, 193 W.Va. 42, 454 S.E.2d 87 (1994).

**1. Plaintiff's Expert Dr. Jenkins Does Not Meet the Requirements of W.Va. § 55-7B-7**

A review of Dr. Jenkins' Declaration (ECF No. 98-4 at 1-2) and *Curriculum Vitae* (Id. at 4-5) reveals that Dr. Jenkins is not competent to provide an opinion as to whether the BOP's medical providers, Dr. Shackelford and PA Wilson, a medical doctor and a physicians' assistant, respectively, breached the applicable standard of care in their treatment of Plaintiff's fractured finger. While Defendant did not object to the sufficiency of Dr. Jenkins' screening certificate of merit, the standard for competency of an expert medical witness under W.Va. § 55-7B-7 is far more stringent. As noted above, by definition in West Virginia, a chiropractor is not a physician. The education, training and experience requirements for a medical doctor are far greater than they are for a chiropractor. As noted *supra,* it is well established that a medical doctor is not qualified to opine as to the standard of care for a chiropractor.[37] Given that, it is not surprising that the undersigned was unable to find a single case where a chiropractor was permitted to offer an opinion as to the standard of care for a medical doctor or physician's assistant that fell outside

---

[37] See generally Taormina v. Goodman, 63 A.D.2d 1018, 406 N.Y.S.2d 350 (1978), Morgan v. Hill, 663 S.W.2d 232, 234 (Ky. Ct. App. 1984); Johnson v. Lawrence, 720 S.W.2d 50, 54-55 (Tenn. Ct. App. 1986); Maxwell v. McCaffrey, 219 Va. 909, 913, 252 S.E.2d 342, 345 (1979; Broderson v. Sioux Valley Memorial Hosp., 902 F. Supp. 931, (N.D. Iowa 1995), *supra* at FN 10 in this R&R.

of a chiropractor's limited area of expertise. In those few instances where a chiropractor has been permitted to testify in a medical malpractice action against a physician, the testimony has been strictly limited to only those matters within the area of the chiropractor's expertise and they are permitted to give expert opinions, to a reasonable degree of medical certainty as to the permanency of injuries only in the areas of the body they are authorized to treat. See generally Klein v. Harper, *supra* at 186 N.W.2d 429-31 (medical opinion regarding permanency of spinal injury); and Ness v. Yeomans, *supra* at 234 N.W. 76-77 (interpretation of X-rays in a medical malpractice action).

Dr. Jenkins, as a chiropractor and not a medical doctor, does not have the requisite professional knowledge, education, training, experience and expertise, coupled with a familiarity with the applicable standard of care to which her opinion is addressed. While she may well maintain a current license to practice chiropracty, she does *not* maintain a current license to practice medicine with the appropriate licensing authority of any state of the United States. Finally, she is not engaged or qualified in a medical field in which she has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. She admits as much in her affidavit, stating that while she is "well versed in personal injury cases involving motor vehicle and slip and fall accidents," she does not provide emergency treatment for crush injuries as required and received by Plaintiff. (Id. at 2).

Further, Dr. Jenkins describes her practice as "patient care in an office setting," diagnosing and treating musculoskeletal conditions of the spinal column and extremities to prevent and correct abnormalities of the body; manipulating the spinal column and extremities to adjust and correct abnormalities caused by neurologic dysfunction; and using diagnostic X-rays and advanced imaging modalities. (Id. at 1). She admits no expertise in emergency medicine; no

experience or training involving decisions such as whether to suture a wound or leave it open, let alone a potentially complex wound at the tip of the finger which also involved a bone fracture fragment; no experience or training in the treatment of and/or setting of broken bones; and no experience or training as to what medications to prescribe. In fact, Dr. Jenkins' second amended affidavit in support of her screening certificate of merit acknowledges that "the ability to prescribe medication(s) is outside the scope of practice for chiropractors in the state of South Carolina" (ECF No. 54-1 at 10), the only state in which she is licensed to practice.

Moreover, Dr. Jenkins' Declaration fails to specifically identify in what way either Dr. Shackelford or PA Wilson deviated from the standard of care, does not address Plaintiff's claim that there was a breach of the standard of care by the "failure to suture" on the day of her injury, and mischaracterizes Plaintiff's condition and the treatment provided by Dr. Shackelford and PA Wilson.[38] The medical references she relies on provide a very limited and broadly general overview concerning the treatment of a tuft fracture like Plaintiff's, instead of the required specific orthopedic medical literature.[39]

West Virginia law requires that a plaintiff establish a defendant's failure to meet the standard of care through the use of expert testimony. Dr. Jenkins fails to qualify as an expert capable of rendering such an opinion. She does not possess the professional knowledge and

---

[38] Dr. Jenkins's Declaration also includes irrelevant references including how to interview and take a patient's history and perform a physical exam (ECF No. 98-4 at 2); attaches copies of a handout on disorders of the hand, wrist and elbow, nearly all of which are not at issue here (Id. at 7-8); copies of what appears to be pages from a chapter on "Finger and Thumb Complaints," detailing the history, evaluation and management of all sorts of traumatic and non-traumatic disorders of the hand, most of which are not at issue in the case at hand (Id. at 10-16); and a flow chart on traumatic hand pain (Id. at 17-18).

[39] Dr. Jenkins cites to the Merck Manual of Diagnosis and Therapy and to Bates' Pocket Guide to Physical Examination and History Taking. She cites to the Nurses Drug Handbook in support of her erroneous conclusion that Plaintiff was mis-prescribed Indomethicin (*aka* Indocin). See ECF No. 98-4 at 2.

experience, coupled with knowledge of the applicable standard of care to which her opinion is addressed. Further, she is not engaged or qualified in the medical field in which Dr. Shackelford and PA Wilson have experience and/or training in diagnosing or treating injuries or conditions similar to those of Plaintiff. Therefore, Plaintiff is unable to support her claims that Dr. Shackelford and PA Wilson failed to meet the standard of care required through expert testimony, and accordingly, her claims must fail. Thus, there are no issues of genuine material fact to preclude summary judgment in favor of Defendant as to the breach of the standard of care.

Even assuming Jenkins could qualify to testify as an expert, Jenkins has not shown that the Defendant's BOP medical providers breached the standard of care in their treatment of Plaintiff. First, Dr. Jenkins opines that a "referral for diagnostic imaging should have been made immediately following the initial complaint by the patient and the evaluation by the . . . provider." (ECF No. 98-4 at 1). The record clearly reveals that Plaintiff *did receive* diagnostic X-rays of her finger immediately after the injury. (See ECF No. 100 at 3, 4 and 6-8).[40] The X-rays identified the tuft fracture.

Next, while not specifically addressing Plaintiff's claim that she should have received sutures *on the day she was injured*, Dr. Jenkins' opinion states generally that "sutures to the area . . . while sufficient to close the open wound . . . would not provide the stability needed for . . . Plaintiff's finger to heal properly, without deformity of the joint." (ECF No. 98-4 at 1). As an initial point, *sutures* are insufficient to provide "stability" for *any fracture.* Moreover, it is undisputed in the medical records that Plaintiff had no injury to any *joint* in her finger. The

_____

[40] On March 31, 2010, at approximately 12:30 p.m., within 20 minutes of her initial visit with Nurse Hamilton, Plaintiff's hand X-rays were taken, identifying the tuft fracture. See ECF No. 100 at 6, 7, and 8.

lacerations and the sutures were below the area of the fracture, alongside the fingernail; the fracture was beyond that, at the very tip of the distal phalanx. The sutures were not intended to allow either the laceration or the fracture to heal without *joint* deformity. The lacerations, on both sides of the fingernail, were well beyond the last joint of the finger. The purpose of the sutures was to close the lacerations after the expected swelling over the first twenty-four (24) hours post-injury caused the formerly closed wound edges to gape open. There simply was no injury to any joint on her finger. To the contrary, by definition, a "tuft" fracture like Plaintiff's is an injury at the furthermost-distal fingertip, far removed from the last, most-distal ("DIP") joint. *If Plaintiff suffered no injury to a joint, she can hardly have sustained any joint deformity.*

Third, while the issue of sufficiency of prescribed pain medication has already been dismissed from the claims against Dr. Shackelford, it is worth noting that Dr. Jenkins criticizes the pain medication allegedly prescribed for Plaintiff, inexplicably suggesting that it was Indomethacin. She states "[o]nce it was reported and determined that the medication(s) caused abdominal distress to the patient, a change in prescription should have been made with instructions to the patient . . . to discontinue taking the previous prescribed medication(s) immediately." It is apparent that Dr. Jenkins is unaware that Plaintiff was never prescribed Indomethacin to treat the pain from her finger injury. Indomethicin was not prescribed until four months later, on July 27, 2010, long after Plaintiff had ceased complaining of pain in her finger, to treat Plaintiff's pain from a new injury.[41] Even the most cursory review of the finger injury records reveals that Plaintiff received Motrin (ECF No. 100 at 5) on the day of her injury;

---

[41] Plaintiff's July 27, 2010, History and Physical ("H&P"), performed shortly after her arrival at FPC Marianna reveals that Indomethicin was ordered that day to relieve pain from a "[c]ontusion of unspecified site." (Id. at 29). Further on that same page, the record indicates that Plaintiff had pain in her right leg due to "aerobic [sic] exercises in 5/2010 and left lower leg with hematoma since the garbage container hit her left lower leg on 7-26-2010." (Id.). Her only reported pain was in her legs, described as level "2" aching pain; she was instructed to "continue Indomethacin PRN [as needed] with food." (Id. at 17).

Tylenol with Codeine (Id. at 9) the next day; and a renewed order to receive three more days of Tylenol with Codeine on April 5, 2010. (Id. at 11). Moreover, there is nothing in any of the finger-related treatment records to suggest that Plaintiff ever complained of abdominal distress from either the Motrin or the Tylenol with Codeine.

Next, Dr. Jenkins points to "the lack of a proper referral for further medical attention for the injury to the left 3rd fingertip." (ECF No. 98-4). Although it is undisputed in the record that Plaintiff received multiple visits for treatment and diagnostic testing for her injured finger while incarcerated, the undersigned construes this as Dr. Jenkins' contention that Plaintiff should have been referred to an outside specialist at the time of injury, presumably an orthopedic surgeon. However, it is equally undisputed from a review of the opinions of the medical providers in Plaintiff's medical records, the opinion of Defendant's orthopedic expert Dr. Bethea and a review of the relevant medical literature *supra,* that Plaintiff's painful, but relatively minor tuft fracture did not rise to the level of requiring an orthopedic referral.

Finally, despite Dr. Jenkins' claim in her July 7, 2015, report that Plaintiff has "visible deformity" of her nail bed and fingernail, the records of the March 31, 2010, injury indicate that Plaintiff *never had an injury to either the nail bed or the fingernail*, only very small lacerations on either side of the nail, which were manageable by two sutures in one and three in the other. Moreover, the subsequent examinations of Plaintiff's finger by every other practitioner since the injury, including the orthopedist Dr. Jenkins referred Plaintiff to, have only revealed "well-healed" scars or no visible deformity at all.

Accordingly, Dr. Jenkins' Declaration falls far short of qualifying as competent expert testimony under W.Va. Code § 55-7B-7. The issues raised in Dr. Jenkin's Declaration fail to demonstrate that either Dr. Shackelford or PA Wilson breached the standard of care required in

the treatment of Plaintiff's injury. The only qualified expert opinions on which to analyze Plaintiff's claims are those of Defendant's orthopedic surgeon, James F. Bethea, M.D., Medical University of South Carolina at Charleston, S.C., and what can be gleaned from the office note of Plaintiff's one visit to Dr. Koon.[42]

### 2. Negligence Claims Against Dr. Janet Shackelford

Plaintiff's remaining claims against Dr. Shackelford are that Dr. Shackelford was medically negligent for failing to suture her finger the day of injury; failing to immobilize or provide a splint for the finger; and for failing to refer her to an orthopedic specialist. Each of these claims will be addressed separately.

### a. Dr. Shackelford's Alleged Negligence for Failure to Suture

Plaintiff claims that Dr. Shackelford was negligent for failing to suture her finger on the day of injury, because PA Wilson told her the next day that the skin around the wound was "dying" and needed suturing to keep Plaintiff from "losing her entire fingertip."

Dr. Shackelford's March 31, 2010, comments concerning her treatment reflect the following: "Wound edges were still fairly well approx [sic] as bone broken and risk of infection will not place sutures (foreign body) and will start bactrim antibiotics prophylactically. Inmate will follow up tomorrow and until wound starts to heal. Warning sx of infection given to inmate to immed [sic] come or have co call to HS." (ECF No. 100 at 3). Further, her notes reflect "Inmate smashed her hand in a door. Cut skin and small amount of bleeding very painful. Xrray [sic] shows distal phalange fractured. Cut dorsal part of finger to below nail and small lacation

---

[42] Plaintiff was referred to David Koon, M.D., Department of Orthopedic Surgery, University of South Carolina, at Columbia, S.C. by her chiropractor Jenkins for an "evaluation." Dr. Koon's note does not offer any opinion as to whether there was any breach in the standard of care by Dr. Shackelford or PA Wilson.

[sic] palm surface of distal 1st finger. Cut was clean and min bleeding. Due to proximity of fractured bone will not place stitch to avoid foreign body and decrease chance of infection. Wound rinsed for five minutes cleaned with betadine then bacitracin ointment and wrapped in sterile guaze [sic] the 4x4's. No splint avail will obtain for tomorrow's dressing change. Start Bactrim DS BID and Motrin. (ECF No. 100 at 4). Dr. Shackelford did not initially suture the lacerations because bone fragments were present, the skin was broken and she wanted to avoid increasing the risk of infection which could result from placing the "foreign body" of a suture so close to a bone fragments. Instead, after thoroughly cleaning and dressing the wound and starting prophylactic antibiotics, Dr. Shackelford scheduled follow up wound care and ordered a splint for the next day.

As an initial point, Plaintiff claims that PA Wilson told her the skin around the edge of the lacerations was "dying." Plaintiff was injured at around noon on March 31, 2010; she was seen and sutured by PA Wilson at approximately 9:30 a.m. the following day. PA Wilson's April 1, 2014, note does not specifically state why the lacerations "did require suturing."

Dr. Shackelford's sworn Declaration in this action indicates that on the following day impliedly disputes Plaintiff's claim that the skin around the edge of the lacerations was "dying;" saying "*when we saw that the wound edges were becoming separated and there was no sign of infection,* the sutures were placed." (ECF No. 98-3 at 2) (emphasis added).

Further, there is no support in the record for Plaintiff's claim that PA Wilson "did not understand why Dr. Shacklelford [sic] had not placed sutures on her finger the day before because it was obvious that they were needed." (ECF No. 1, ¶5 at 9). PA Wilson specifically states she has no recollection of saying such a thing, and that "[b]ased on my notes it is clear that the wound was likely more swollen and thus, more gaped open . . . than the previous day when

Dr. Shackelford . . . [saw] the wound." (ECF No. 98-2 at 3). PA Wilson's explanation that the need for stitches was because the swelling had caused the wounds' edges to separate is consistent with Dr. Shackelford's. Neither provider indicated that the skin around the edges of the lacerations was "dying," let alone that there was any danger of Plaintiff "losing her entire fingertip." Regardless of whether PA Wilson remarked that the skin around the lacerations was dying or not, or whether sutures were placed to close the lacerations or for some other reason, these points do not raise genuine issues of material fact regarding any breach of the standard of care provided by Defendant to Plaintiff.

In her traverse, Plaintiff challenges PA Wilson's sworn Declaration that stated she did not suture beneath Plaintiff's fingernail because the lacerations did not extend under it, claiming that this is factually untrue and pointing to Nurse Hamilton's March 31, 2010, note that states otherwise.[43] Nurse Hamilton's record does indeed say that the laceration extended under the nail; however, it is also apparent from the totality of the records that Nurse Hamilton's March 31, 2010, note was inaccurate. First, Nurse Hamilton only documented one laceration; it is obvious both from Plaintiff's own statement that she had "two . . . lacerations, on either side of her left middle finger, out from the nail." (ECF No. 1-2 at 1) and from the later medical records of Dr. Shackelford and PA Wilson who more carefully observed the wounds after they were rinsed and cleansed, that there were actually two separate lacerations, one on either side of the fingertip.[44] It is apparent from the record that Nurse Hamilton made no attempt to clean the wound but

---

[43] "A laceration is present running under the nail bed [sic] and around to the pad of the finger." ECF No. 100 at 2.

[44] At 12:56 p.m. on March 31, 2010, Dr. Shackelford noted "[c]ut skin and small amount bleeding very painful . . . Cut dorsal [top] part of finger to below nail and small lacation [sic] palm surface of distal 1st finger . . . min[imal] bleeding." ECF No. 100 at 4. The following day, when PA Wilson sutured the finger, she noted "2 lacerations on either side of left middle finger, out from nail." ECF No. 100 at 9.

immediately referred Plaintiff to Dr. Shackelford for evaluation. (ECF No. 100 at 2). Whether Nurse Hamilton was in error regarding a laceration under the nail or not does not give rise to a genuine issue of material fact to defeat summary judgment as to whether Dr. Shackelford breached the standard of care with regard to Plaintiff's treatment.

Dr. Shackelford's decision to delay suturing is consistent with the opinion of Defendant's orthopedic expert, James F. Bethea, M.D.,[45] and has support in the medical literature.[46] Plaintiff's own orthopedist's (Dr. Koon) September 15, 2015, exam note makes no mention of Plaintiff even reporting sustaining any lacerations at the time of injury and does not document seeing any "well-healed" scars.

Finally, even assuming *arguendo* that Dr. Shackelford *had* negligently failed to suture Plaintiff's finger the day of injury, it would be moot, because such alleged negligence did not proximately cause Plaintiff to "lose her entire fingertip." Therefore, Plaintiff could not recover for the same. W.Va. Code § 55-7B-3; see also Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939).

Accordingly, Plaintiff has failed to state a claim for negligence against Dr. Shackelford for failing to suture her finger on the day of injury. Therefore, it appears that no genuine issue of

---

[45] "Suturing of her left middle finger wounds was also not mandatory. Due to the excellent blood supply to the fingers, these wounds were bound to heal well even if not sutured. I agree with Dr. Shackelford that the safer approach could very well have been to leave these wounds open so that an infection would not develop." ECF No. 98-5 at 4.

[46] "As the majority of these injuries are due to crushing, edema of the soft tissues is most likely to develop and primary closure of any associated skin lacerations is not advisable." See Thumb Reduction & Fixation, *available at* https://www2.aofoundation.org/wps/portal/surgery?showPage=redfix&bone=Hand&segment=Thumb&classification=76Distal%20phalanx:%20Distal%20and%20Shaft,%20Transverse&treatment=&method=Transverse%20distal%20and%20shaft%20fracture&implantstype=Kwire%20fixation&approach=&redfix_url=1285238721570&Language=en.

material fact exists with regard to this claim and that summary judgment should be granted for Defendant.

### b. Dr. Shackelford's Alleged Failure to Splint

Plaintiff's next claim is that Dr. Shackelford was negligent in treating her finger injury because she did not provide Plaintiff with a splint for her finger on the day of injury, thus causing the fracture non-union.

The Oxford Dictionary defines "splint" as "[a] strip of rigid material used for supporting and immobilizing a broken bone when it has been set."[47] By that definition, a splint can be as simple a device as two popsicle sticks applied to either side of a finger, held in place with strips of cloth, gauze or tape; indeed, in emergencies, a rolled magazine can function as a splint for an arm.[48]

While Dr. Shackelford's March 31, 2010, note does state that no "actual" splint was available the day Plaintiff was injured, Dr. Shackelford specified that one would be obtained for Plaintiff's dressing-change-visit the following day. Dr. Shackelford's sworn Declaration in the instant action states as follows:

> I am aware that Plaintiff contends that her finger should have been splinted on March 31, 2010. A splint, however, can be used for a tuft fracture (like Plaintiff's) to prevent further injury to the fingertip. Instead of a splint, we accomplished this objective by placing a large 4 inch by 4 inch bandage to cover the bandage [sic]. This bandage immobilized the distal joint to avoid discomfort.

ECF No. 98-3 at 2-3.

---

[47] See Splint, *available at* http://www.oxforddictionaries.com/us/definition/american_english/splint.

[48] See First Aid for Fractures, *available at* http://www.firstaidanywhere.com/first-aid-for-fractures.html ("Splints may be improvised from such items as boards, poles, sticks, tree limbs, rolled magazines, rolled newspapers, or cardboard. If nothing is available for a splint, the person's chest can be used to immobilise a fractured arm and the uninjured leg can be used to immobilise, to some extent, the fractured leg.").

As noted *supra,* because there was no commercial splint available on the day of injury, Dr. Shackelford wrapped Plaintiff's already-bandaged finger in multiple layers of "4x4" gauze sponges[49] to immobilize it, creating a *de facto* splint[50] to protect the fingertip until the "actual" splint could be obtained the following day. (ECF No. 100 at 4 and ECF No. 98-3, ¶ 6 at 2-3).

As promised, the next day, PA Wilson had available and did apply a "protected finger covering" (ECF No. 100 at 9), i.e., what Plaintiff refers to herein as a "hard plastic protective covering" to Plaintiff's finger after suturing and re-dressing the wound. (Id.).

In her objection to the previous R&R, Plaintiff insists that "[i]t's not clear that the hard plastic protective covering was an immobilizing device, due to the fact that it wasn't fitted, it was taped on, for the protection of the sutured fingertip." (ECF No. 64 at 3). Further, she argues that "defendants [sic] were negligent by failing to consistently provide a splint for her fractured finger" (Id. at 8) and that the "hard plastic covering" was only intended "to protect the sutured finger" . . . not the fracture. A splint was necessary to provide immobilization to the fracture finger to heal properly." (Id.). In her traverse to Defendant's most recent dispositive motion, she elaborates on this same argument, insisting that the thick 4x4 bandage that Dr. Shackelford applied was *not* a splint, because "[n]owhere in the medical record" does it say "that the bandage was used to keep the fracture stabilize [sic]. It is clear that the bandage was use for the wound/laceration of the finger." (ECF No. 102 at 8).

---

[49] "4x4" sponges are commonly and readily available for sale at any drug store, medical supply provider, and on Amazon.com. They come in either 4 ply, 8 ply, or 12 ply; thus, no matter which "ply" is chosen, it is clear that multiple layers of any type of 4x4 sponges would provide considerable stiffness and bulk when applied over top of an already-bandaged finger. See Medline Gauze Sponges 4x4, *available at* http://www.amazon.com/s/?ie=UTF8&keywords=medline+gauze+sponges+4+x+4&tag=googhydr-20&index=aps&hvadid=77267805517&hvpos=1t2&hvexid=&hvnetw=g&hvrand=168174612332582241 94&hvpone=&hvptwo=&hvqmt=b&hvdev=c&ref=pd_sl_1hacidzs6y_b.

[50] For a tuft fracture, wearing "a bulky bandage or a "thimble" type plastic splint can be helpful in preventing knocking the distal phalanx while it heals." See Distal Phalangeal Fractures, *available at* http://www.melbournehandsurgery.com/fractures/36-hands/fractures/191-distal-phalangeal-fractures.

Despite Plaintiff's continued insistence that she never received a splint at all, Plaintiff admits that she did in fact receive the rigid plastic covering the next day. It is also undisputed that Plaintiff's wounds were wrapped in 4x4 sponges until the hard plastic covering was applied the following day. It is further undisputed that both methods were used to stabilize the fracture and protect the fingertip from further injury until it healed. Attached as Exhibit 1 to its reply, Defendant has produced a picture of the form-fitting, finger-shaped "hard plastic covering" that Dr. Shackelford ordered to be applied to Plaintiff's finger the day after the injury. Despite Plaintiff's continued insistence that the rigid plastic covering that was applied the next day "wasn't a immobilized [sic] device" (ECF No. 56 at 8) but merely a "protective covering" for the laceration, the photograph clearly shows that there is no way Plaintiff could have moved her fingertip while she was wearing it, thus, it *was* an immobilizing device, i.e., a splint, regardless of what it is called.

Nevertheless, the dispute regarding whether the 4x4 sponges and/or the hard plastic covering were splints or not does not give rise to a genuine issue of material fact to defeat summary judgment. There is nothing in the record to support Plaintiff's claims that the treatment she received from Dr. Shackelford fell below the required standard of care.

Plaintiff's traverse also impliedly asserts that Dr. Shackelford was negligent for not ordering follow-up X-rays when she returned on April 5, 2010 (when she went back for more pain medication), or on April 13, 2010 (when she returned for suture removal), to verify that the bone was healing properly. (ECF No. 102 at 9). However, there is no expert testimony to support her allegations that follow up X-rays were required or even necessary or that the failure to order them was the proximate cause of her injuries.

Plaintiff also insists that she "should of [sic] had a follow-up appointment for her fractured finger to be certain that it was healing correctly." (ECF No. 64 at 9). This claim is not supported by Plaintiff's medical records; it is clear from the record that each time Plaintiff was seen in health services by Defendant's BOP health providers, the provider who saw her specifically counseled her on what symptoms to watch for and instructed her to return immediately if she had any problem. (ECF No. 100 at 2, 3, 5, 9, 12, 30). While Plaintiff was free to return for any problem at any time, she did not return for over nine months. (Id. at 30).

Finally, while Plaintiff's own orthopedic surgeon's note is merely a note of an office exam, not an opinion as to whether the care she received at the time of her injury was improper, Defendant's expert orthopedist Dr. Bethea, who reviewed the records, while not specifically addressing the splint issue, stated that "there was no breach in the standard of care regarding the treatment provided to [Plaintiff]." (ECF No. 98-5 at 4).

Accordingly, after a careful and thorough review of the record, it appears that no genuine dispute to any material fact exists as to this claim and that summary judgment should be granted for Defendant.

### c. Dr. Shackelford's Alleged Failure to Refer Plaintiff to Orthopedic Specialist

Plaintiff's next claim is that Dr. Shackelford was negligent for not referring her to an orthopedic specialist on the day of her injury.

Plaintiff had a 2 mm-sized[51] bone fracture fragment. (ECF No. 97-1 at 38, 40, and 42). At the time of injury, it was not displaced and there was no way to predict that a nonunion would occur. Again, Dr. Shackelford's initial evaluation of the fracture indicated that because of the

---

[51] Two millimeters is equal to 0.0787402 inches. See Millimeters to Inches Conversion, *available at* http://www.rapidtables.com/convert/length/mm-to-inch.htm.

size of the two millimeter fracture fragment, and its location, only two millimeters from the fingertip, surgery was not medically indicated, and thus no referral was indicated. Dr. Toledo, the Clinical Director at FPC Marianna, concurred. Plaintiff's own orthopedic surgeon, Dr. Koon, does not address the issue in his September 15, 2015, office note. However, Defendant's expert, Dr. Bethea, concurring with Dr. Shackelford, opined that "[t]his injury was not so severe that an outside orthopedic specialist was mandatory. There was no indication for surgery." (ECF No. 98-5 at 4). These opinions are in agreement with the relevant medical literature, *supra.* It is apparent that the fracture was so minor and so stable, given that the pad of her fingertip and her fingernail were intact, that it did not warrant an orthopedic consult.[52] Plaintiff's allegations are not supported by expert opinions that the treatment received fell below the standard of care required and are not supported by the medical records concerning the treatment she received. As such, Plaintiff's bare allegations of negligence do not raise genuine issues of material fact and summary judgment for the Defendant is warranted.

### 3. Medical Negligence Claims Against PA Wilson

Plaintiff claims that PA Wilson was negligent for failing to immobilize her fingertip and failing to refer her to an orthopedic specialist. These claims will be addressed in turn.

#### a. PA Wilson's Alleged Failure to Splint

Plaintiff claims that PA Wilson negligently failed to provide her with "a splint or other immobilizing device."

As noted *supra* in the same claim against Dr. Shackelford, PA Wilson did apply a splint, in this case, a hard plastic covering, approximately twenty-one hours after the injury. Also as noted *supra,* attached to its reply, Defendant produced a picture of the rigid plastic, form-fitting,

---

[52] See Finger Fractures and Dislocations, *available at* http://practicalplasticsurgery.org/docs/Practical_30.pdf.

finger-shaped splint that PA Wilson applied to Plaintiff's finger the day after the injury. It is apparent that it was indeed a splint, regardless of what Plaintiff chooses to call it or what it is referred to in the medical record. (ECF No. 104-1 at 2). Merely because it was not the exact same splint Plaintiff envisioned does not mean it was not a splint.

A non-union is a potential complication of a tuft fracture.[53] Consistent with that, Defendant's expert, Dr. Bethea, opined that "[l]ack of healing would not have been prevented by the use of a splint as this would have been caused by the injury." (ECF No. 98-5 at 4). As previously noted, a splint is not even a mandated requirement in the treatment of a tuft fracture; nonetheless, because PA Wilson did in fact provide a splint when she saw Plaintiff on April 1, 2010, this claim lacks support in the record and contradicts Plaintiff's own claims in the Complaint.

There being no genuine issue of material fact, summary judgment should be granted to Defendant on this claim.

    **b.**     **PA Wilson's Alleged Failure to Refer Plaintiff to Orthopedic Specialist**

Plaintiff claims that PA Wilson was negligent because she did not refer Plaintiff to an orthopedic specialist.

Again, Dr. Shackelford's initial evaluation of the fracture indicated that because of the size of the two millimeter fracture fragment, and its location, only two millimeters from the fingertip, surgery was not medically indicated. (ECF No. 98-3 at 3). Dr. Toledo, the Clinical Director at FPC Marianna, concurred. (ECF No. 100 at 42). Plaintiff's own orthopedic expert, Dr. Koon, does not address this claim. Defendant's expert, Dr. Bethea, opined that "[t]his injury was not so severe that an outside orthopedic specialist was mandatory. There was no indication

---

[53] See Fractures and Dislocations of the Hand, Skeletal Trauma, *available at* http://z0mbie.host.sk/Fractures-and-Dislocations-of-the-Hand.html.

for surgery." (ECF No. 98-5 at 4). Finally, Plaintiff has no expert testimony to support her allegations that the medical care she received fell below the standard of care required. Plaintiff fails to point to a single act or omission by PA Wilson which constitutes medical negligence and her unsupported allegations do not create genuine issues of material fact sufficient to defeat Defendant's motion for summary judgment.

Plaintiff has failed raise a genuine issue concerning whether either Dr. Shackelford or PA Wilson failed to exercise the degree of care, skill, and learning required of a reasonable, prudent health care provider in the profession or class to which they belong, acting in the same or similar circumstances, let alone that such failure was a proximate cause of any injury to her.[54] Further, because Plaintiff has not produced "an expert witness qualified to testify as to the applicable standard of care and a breach thereof . . . she cannot establish a prima facie case of medical negligence and summary judgment is proper." <u>Withrow v. West Virginia University Hospitals, Inc.</u>, 213 W.Va. 48, 52, 576 S.E.2d 527, 531 (2002).

## E.     Damages

Finally, Plaintiff's claims for anticipated medical expenses, loss of earning capacity, pain and suffering of mind and body, and permanent disability and disfigurement have no merit. None of the medical providers who have treated or examined have opined that future surgery or treatment is required. Likewise, Plaintiff's claim of disfigurement, joint deformity or deformity of her finger have no support in the record. It is undisputed she had no injury to the joint. The January 13, 2011, X-ray of the finger, attached to Defendant's response, clearly shows the outline of the soft tissue of Plaintiff's finger as well as the bone; there is no obvious or visible swelling or deformity in the outline of the finger. (ECF No. 100 at 37). Finally, Plaintiff's

---

[54] W.Va. Code §55-7B-3.

repeated claims of bone *fragments* (plural) and "post-traumatic arthritis" have no support in the medical records.

As for Plaintiff's claim of pain and "permanent disability" from the nonunion of this bone fragment, repeated exams of Plaintiff's finger by credible medical providers have indicated that she has only some slight numbness on one side of her finger and suffers no pain unless she presses on the fingertip.[55]

Despite Plaintiff's claim for damages, there is no support in the record for her contention that the treatment and/or lack of treatment, which she alleges fell below the standard of care, was the proximate cause of her alleged damages. There is no evidence in the record and no expert opinions to support her damage claims. Any pain, suffering, disability or disfigurement, past, present or in the future, are the result of the injury itself and not the result of the care and treatment she received.

Accordingly, even if the treatment provided by Dr. Shackelford and PA Wilson had fallen below the required standard of care, any such negligence was not the proximate cause of the damages Plaintiff claims. There being no evidence or expert opinion to support her claims for damages, summary judgment for the Defendant is appropriate.

---

[55] Moreover, it is apparent from a careful review of the record that her March 31, 2010, finger injury has not been so painfully disabling that it has precluded her from participating in vigorous aerobic exercises at Hazelton SFF one month later, in May, 2010 (ECF No. 100 at 17 and Case No. 1:12cv131, ECF No. 32-3 at 1); pulling a garbage container at FPC Marianna almost four months later, on July 26, 2010 (ECF No. 100 at 17); since August 21, 2012, filing and actively litigating not only this but eight other *pro se* cases, by typing numerous pleadings, motions and responses, presumably using her fingertips; being cleared for "all sports" and for working food service at FCI Tallahassee in late April 2012 (Id. at 43); and, since being released from BOP custody on October 30, 2015, from taking classes at a technical college. (ECF No. 98-7 at 2). From the level of Plaintiff's activity since her March 31, 2010, injury, it appears that that despite her claims to the contrary, she may very well be one of those patients with nonunion who is asymptomatic enough that she is able to "use[] the hand without any difficulties, [such that] radiographic nonunion should be ignored." See Fractures and Dislocations of the Hand, Skeletal Trauma, *available at* http://zOmbie.host.sk/Fractures-and-Dislocations-of-the-Hand.html.

## F.      The Prison Litigation Reform Act of 1996

The Prison Litigation Reform Act of 1996 ("PLRA") has restricted when an inmate's complaint may be filed without prepayment of fees. Specifically, 28 U.S.C. § 1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Here, a February 29, 2016, PACER review of Plaintiff's filings reveals that, including this case, she has filed nine _Bivens_ and/or FTCA actions since August 21, 2012, three of which have been dismissed for failure to state a claim upon which relief can be granted.[56] One of those dismissals was then affirmed on appeal, giving her a fourth strike.[57]

Accordingly, Plaintiff is again warned that pursuant to 28 U.S.C. § 1915(g), she will not be granted _in forma pauperis_ status in the future, if she has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."

## V.      <u>RECOMMENDATION</u>

---

[56] As of July 28, 2014, Plaintiff has achieved four strikes: <u>Jacobs v. Abad</u>, 5:12cv363 (N.D. Fla. Feb. 25, 2014(<u>Bivens</u> dismissed for failure to state a claim); <u>Jacobs v. United States</u>, 5:13cv69 (N.D. W.Va. Apr. 14, 2014 (FTCA dismissed for failure to state a claim, warned of 3-Strikes Rule), _aff'd,_ No. 14-6676 (4th Cir. Sep. 30, 2014); <u>Jacobs v. Wilson</u>, 3:13cv89 (N.D. W.Va. July 24, 2014) (<u>Bivens</u> dismissed for failure to state a claim; warned again of 3-Strikes Rule).

[57] Federal appeals court rules that dismissal of a lawsuit as frivolous, or dismissal of an appeal as frivolous, will each count as one "strike" against a prisoner under the "three strikes" rule of the Prison Litigation Reform Act, even if the prisoner paid a full filing fee for the lawsuit or appeal. <u>Duvall v. Miller</u>, 122 F.3d 489 (7th Cir. 1997).

For the reasons set forth above, it is recommended Defendant's Motion for Summary Judgment (ECF No. 98) be **GRANTED** and that Plaintiff's Complaint be **DISMISSED with prejudice.**

**Within fourteen (14) days** after being served with a copy of this recommendation**, or by March 28, 2016**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208.

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to her last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

Date: March 14, 2016

/s/ *Robert W. Trumble*
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE